UNITED STATES, Appellee

v

OTTO SULIMA, Jr., Specialist Five, U. S. Army, Appellant

11 USCMA 630, 29 CMR 446

No. 13,753

Decided July 8, 1960

*First Lieutenant Ralph T. Smith* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

*First Lieutenant George H. Parsons* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Stuart Goldstein.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The accused was found guilty of communicating a threat to one victim and committing an assault consummated by battery on another, in violation of Articles 134 and 128, Uniform Code of Military Justice, 10 USC §§ 934 and 928, respectively. He was sentenced to bad-conduct discharge, total forfeitures, confinement at hard labor for one year, and reduction to the lowest enlisted grade. The convening authority approved, but the board of review, after affirming the findings, reduced the sentence to forfeiture of $70.00 per month for six months, confinement at hard labor for the same period of time, and reduction to the lowest enlisted grade. We granted accused's petition for review to answer three specific issues involving the threat offense. Stated generally they raise doubts about the instructions on the elements of the crime, the definition of the word "threat," and the sufficiency of the specification to state an offense.

### II

The first question requiring resolution is whether the law officer's instructions required the court-martial to find on an essential factual issue. The operative facts necessary to a proper understanding of that question are these. The appellant, a military policeman, obtained an off-duty job of collecting delinquent accounts for a certain firm doing business in Augusta, Georgia. On the evening in question, he, together with three or four other men, stopped the victim, Private Grimm, who was driving his automobile in that city. Grimm owed a bill to the business concerned, and the accused was intent upon its collection. Grimm was unwilling to accompany accused to the establish-

**631**

ment to discuss the matter, but the latter did induce him to proceed to a nearby grocery store to talk over the telephone with one Cady, who had an interest in the business, about a settlement of the bill. There accused removed his wallet from the inside breast pocket of his suit, dropping a six-inch steak knife to the floor as he did so. According to Grimm, accused made sure he observed the knife before replacing it, and naturally after that event Grimm complied with the request to call. In the course of the conversation, Grimm informed Cady that he was unable to pay the bill at that time and that he would not come to the place of business because of his knowledge that accused had viciously assaulted another debtor in the rear of the establishment earlier the same day. During the telephone conversation, the accused took the telephone from Grimm and, while looking at him, said, "I got these two guys; . . . they aren't going anywhere; we'll get the money one way or another." As a result of the statement and accused's activity contemporaneously therewith, Grimm became apprehensive of his physical safety and would not leave the grocery store while accused and his companions waited across the street. Finally, as closing time for the store neared, Grimm telephoned for police assistance.

The accused took the witness stand in his own behalf and admitted most of the above related testimony. However, he asserted he was not threatening the victim when he stated, "We will get the money one way or another." He also stated he did not ordinarily carry a knife and he could assign no reason for possessing it at that time but claimed that it fell out of his pocket accidentally when he extracted his wallet for the sole purpose of furnishing Cady's telephone number to Grimm. Accused contended the statement was directed only to Cady and that he was merely trying to convey to the latter the idea that, since he was unable to collect the debt, it would be necessary to take the matter up with the victim's unit commander or obtain a warrant for collection. He admitted, however, that Grimm could have heard him make the statement. We assume

from accused's contention of no intent to threaten unlawfully that the latter method is a legal means of instituting a suit for recovery of money in the State of Georgia. Thus, the only factual issue was whether the accused was threatening the victim with physical violence or merely suggesting that different and lawful means would be employed to collect the account. The law officer in his instructions to the court members stated the law to be as follows:

". . . With regard to Specification 2, the court, in order to convict the accused, must find beyond a reasonable doubt that, on 2 May 1959, at or near Augusta, Georgia, the accused, without justification or excuse, wrongfully communicated to Private Larry L. Grimm a threat to injure him by saying, 'we will get the money one way or another,' or words to that effect. And two, that, under the circumstances, his conduct was to the prejudice of good order and discipline in the armed forces, or was of a nature to bring discredit upon the armed forces. Now, the term 'communicated to' means to make known to, and it may be directed to and intended for one person, although physically directed to another. In other words, it may serve two purposes. The term 'threat' means an avowed present determination or intent to injure presently or in the future the person, property, or reputation of another."

Accused contends the instruction is deficient for the reason that it does not require the court-martial to find that the accused's statement coupled with his acts constituted a threat. On the other hand, the Government insists that if we look to the four corners of the instructions, they are adequate in that regard to set out the necessary guideposts for the court-martial. In the light of this record, we are required to reject the contention of the accused.

For the purpose of this part of our discussion, we are willing to accept the defense premise that, when broken down into its necessary parts, the instruction

**632**

requires the court to make only two factual determinations. The first is whether the accused, without justification or excuse, wrongfully communicated a threat to the victim which in substance and effect was, "We will get the money one way or another." And the second is that the accused's conduct was either to the prejudice of good order and discipline in the armed services or was an act tending to bring discredit upon them. However, we direct attention to the fact that the law officer defined the word "threat" as "an avowed present determination or intent to injure presently or in the future the person, property or reputation of another." If, therefore, we substitute the definition for the word "threat" in the first determination required by the instruction, we find the court-martial was informed that it must find beyond a reasonable doubt that the accused communicated to Private Larry L. Grimm an avowed present determination or intent to injure him presently or in the future. By its findings of guilty, the court-martial members concluded that accused's statement and conduct did amount in law to a threat as defined by the law officer. All accused contends for now is that the court-martial members should have been required to make the factual determination we set out above and, as we interpret the instruction, they were required to do so. Of course, the law officer could, by substituting the definition of the word "threat" in its stead, render the instruction more clear and precise. However, no one seemed concerned about ambiguity or clarity at the trial level, for defense counsel was offered two opportunities to ask for other instructions, and he expressed satisfaction with those given. The defense not having asked for clarifying or amplifying instructions, any complaint in that regard is registered too late. United States v Kloh, 10 USCMA 329, 27 CMR 403; United States v Phillips, 3 USCMA 137, 11 CMR 137; United States v Felton, 2 USCMA 630, 10 CMR 128.

Our conclusion that the court-martial would have construed the instruction as we have indicated is strengthened by at least two in-court incidents. In connection with the introduction of certain evidence, the law officer spelled out clearly that the court-martial members' duty was to determine whether the words spoken under the circumstances constituted a threat. Upon completion of the victim's testimony, the law officer gave this explanation:

"I have a statement before you call the witness. While the court's recollection of the testimony of the last witness is still fresh in mind, I would like to advise the court that it may consider the testimony of the witness, Grimm, with regard to what Wainwright told him, only for the purpose of establishing the frame of mind and understanding of this witness of the words allegedly spoken by the accused to him, and you may consider his understanding of the words as some evidence, together with all the other evidence in the case in the court's determination of whether or not the words spoken actually constituted a threat, and that is the only basis upon which the court may consider Grimm's statement as to what Wainwright told him."

On another occasion, a court member was desirous of obtaining certain information from a witness. The law officer refused to allow any interrogation in the particular area, and he stated his reason in this language:

"That is immaterial in the case, and I don't think we should inquire into it. All we are concerned with is the guilt or innocence of the accused. Did he, in fact, communicate a threat and assault—communicate two threats and assault, as alleged, and I'd be delighted to discuss this with the member of the court if he likes to after the case is finished."

III

Accused next contends that the instruction prejudiced him in that it was too board, for it permitted ▮▮▮▮▮▮ ▮ the court-martial to find him guilty if the members concluded he threatened damage to Grimm's property or reputation. The

contention is two-pronged. First, it is argued that a threatened damage to reputation and property will not support a conviction of this offense. In United States v Frayer, 11 USCMA 600, 29 CMR 416, we ruled to the contrary, and that holding is dispositive of this arm of accused's argument.

It is next asserted that the instruction brought within its sweep damage to both person and reputation and that it is impossible to ascertain whether the court-martial based its finding on damage to either or both. In other words, the accused contends the members were permitted to consider alternative hypotheses. To support the argument, defense counsel call our attention to the testimony of accused that in uttering the words he intended to convey the impression that he would either report the delinquency to the victim's unit commander or obtain a warrant. From this evidence accused asks us to conclude the court could find a threat to injure the victim's reputation when in law accused was suggesting a perfectly legal method of collection.

Obviously, if there was substantial evidence to support each of the two mentioned theories, there would be no error in permitting the court to consider both. However, we need not discuss that possibility for we bottom our conclusion on two other reasons. First, no reasonable court-martial member would close his eyes to the clear and positive evidence that the injury threatened was physical and seize upon the bare possibility that damage to reputation was involved. Figuratively speaking, no one participating in the courtroom drama could have missed seeing the mountain and observed the molehill. Neither did the participants at the time the threat was uttered. A short recitation of the facts will dispel any doubt about those two assertions. One delinquent debtor of the same establishment had been manhandled by the accused and his friends when he failed to pay, and the group was waiting to play a part in this drama. While the accused was inside the grocery store and disclosing his possession of a dan-

gerous weapon, the others were on the outside available for duty. Had a report to the unit commander been the means to be employed, it is doubtful that the nocturnal activities of a gang, including stopping the victim at night, imploring him to proceed to the place of business, importuning him to call the proprietor, informing him that the money would be collected one way or another, and waiting for him to leave the haven of the grocery store would have been necessary. Legal means are available during working hours, and they hardly require such a showing of strength as is portrayed by this record. Moreover, reactions sometimes offer a clue to the message conveyed in a colloquy, and it appears a bit farfetched to suggest that the victim would solicit police protection before leaving the store if the words and actions of accused did not portend a hazardous homeward journey for him. Finally, the trial and defense advocates expressed their inferences from the facts and, from the thrust of their final arguments, they seemed to understand that the issue encompassed physical violence.

But, aside from the improbability of the court members using threats to property and reputation to support their findings, the instructions as applied to the facts of record would preclude them from basing their findings on any such hypothesis. At no time was damage to property ever brought into the case and, insofar as damage to reputation is concerned, the court-martial had to find that the threat was without justification or excuse; that it was wrongful; and that it was either to the prejudice of good order and discipline in the armed forces or of a nature to bring discredit upon them. There was no dispute about the fact that the victim was indebted to the business firm, and there is nothing wrongful, prejudicial to good order, or service-discrediting for an agent of a company to tell a serviceman-debtor that he will notify a unit commander of the serviceman's delinquency if there is an indebtedness due. Nor does the statement to a debtor that legal processes will be commenced offend against the law or the mores of the military

society. Both of those suggested means of collection are justifiable methods of proceeding against a debtor, and surely no court member would find an avowed intent to use a well-recognized legal method of collecting an admitted debt wrongful. Particularly is that so when the evidence clearly led the members to a finding that physical violence was in the offing as soon as the opportunity presented itself.

## IV

Lastly, the accused contends that the specification does not allege an offense. No attack was leveled at the pleadings at the time of trial and, accordingly, if there is an offense stated, regardless of how loosely, this assignment of error must fail.

In United States v Sell, 3 USCMA 202, 11 CMR 202, we set out the test of the sufficiency of a charge in the following language:

". . . The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet; and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. Furthermore, when the pleadings have not been attacked prior to findings and sentence, it is enough to withstand a broadside charge that they do not state an offense, if the necessary facts appear in any form or by fair construction can be found within the terms of the specification. For a certainty, appellate tribunals should not permit a pleading to be challenged for the first time on appeal merely because it is loosely drawn."

Here, every element of the offense is alleged, although it can be asserted that the specification does not catalogue the injury as being against the person, property, or reputation. As we have previously indicated, any of those three injuries will support the charge and, had the accused wanted the allegations to be more specific in that regard, he should have made a motion to that effect prior to trial. It is not necessary for the prosecution to allege evidentiary facts, and we find nothing missing in this specification which is essential to state the offense or which might make it possible for the Government to proceed subsequently against the accused for the same crime.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

In United States v Frayer, 11 USCMA 600, 29 CMR 416, I expressed the belief that Uniform Code of Military Justice, Article 127, 10 USC § 927, is pre-emptive of Code, supra, Article 134, 10 USC § 934, with regard to threats made for the purpose of extorting "anything of value or any acquittance, advantage, or immunity." Code, supra, Article 127; United States v Norris, 2 USCMA 236, 8 CMR 36; United States v Johnson, 3 USCMA 174, 11 CMR 174. In that case, the threat was made for the purpose of preventing unfavorable testimony against the accused. Here, it was made for the purpose of obtaining money. Thus, the crime of extortion is even more clearly alleged and proved in the instant case than it was in United States v Frayer, supra. Conceding, therefore, that the law officer's instructions were correct with respect to communication of a threat, I am of the opinion that the specification does not set forth that offense. Accordingly, I record my disagreement with the majority's affirmance of the findings of guilty with respect to specification 2 of Charge I.

I would reverse the decision of the board of review and return the record of trial for reassessment of sentence or a rehearing.