UNITED STATES, Appellee

v

GARTHWAIT H. GILLULY, Sergeant, U. S. Army, Appellant

13 USCMA 458, 32 CMR 458

No. 16,165

February 21, 1963

*Captain Robert L. Brosio* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod* and *Captain Thomas Stapleton*.

*Captain Otis D. Chapoton* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper*.

## Opinion of the Court

QUINN, Chief Judge:

Telephone calls, which at trial were represented by the accused as a "practical joke," led to his conviction for communicating a threat to blow up the officers and noncommissioned officers clubs at Fort Hood, Texas. The convening authority affirmed the findings of guilty, and substantially modified the sentence by changing the discharge to a bad-conduct discharge and reducing the period of confinement to six months. His action was affirmed by a board of review. We granted further review to consider a number of the accused's assignments of error.

At trial, there was substantial agreement on most of the facts. The accused was at the noncommissioned officers club drinking beer. He was dressed in fatigues. At about nine o'clock he attempted to enter the lobby of the club from the bar in order to use the telephone, but was denied admission because of his attire. He got "sort of mad." He returned to the bar and drank "a couple more beers." In the course of his drinking, he "got the idea" of calling the club to say that a bomb had been planted in it. To put the idea into execution, he proceeded to a telephone booth outside a nearby post exchange. The telephone was a battery type which, unlike the dial type, required the services of an operator to complete the call. The accused talked to Earlena Watts, the assistant chief operator. He told her to " 'listen and listen good' "; he had " 'a bomb planted at Fort Hood [for his "buddies"], one at the Officers Club and one at the NCO club to go off at 11:05.' " Mrs. Watts signaled the local civilian police who listened in on the conversation. After a time the accused hung up. About five minutes later, however, he again called. He repeated his earlier statements about the bombs, and asked Mrs. Watts to meet him at the Fiddlers Green club.

He ended this conversation when he thought she was trying to get him "all messed up."

According to a pretrial statement by the accused, which was admitted in evidence, he "wanted to scare someone." After the second call he returned to the noncommissioned officers club to "see what would happen." He noticed a large number of people leaving, and he thought his calls had "paid off." He entered the club but "found everything normal." Consequently, he concluded that the crowd had left because the bingo game had ended. He had "about two more beers" and his "mad" became "aggravated" because "they [had not] empt[ied] the club" in response to his calls. He decided to make another call. He drove to the town of Killeen and placed a call to Mrs. Watts. He asked her to meet him; and told her that if she did "the bombs would not go off." She agreed, and a meeting place and time · were arranged. The accused waited in his car across the road from the meeting place. When Mrs. Watts did not appear he left the area, but apparently deciding to wait somewhat longer, he started back to the meeting place. At that point he was apprehended by civilian police. Testifying at trial, the accused said he did not place any bombs in either club; that he had no intention of injuring anyone; and that he "just thought . . . [he] was doing it as a practical joke."

Three of the accused's assignments of error concern the elements of the offense. He contends that these vary according to whether there is evidence of an actual intention to injure the person threatened. The argument rephrases in new terms old claims that have been previously rejected.

The offense is complete when one wrongfully communicates to another an

" 'avowed present determination or intent to injure presently or in the future.' " United States v Holiday, 4 USCMA 454, 456, 16 CMR 28. The intent which establishes the offense is that expressed in the language of the declaration, not the intent locked in the mind of the declarant. United States v Humphrys, 7 USCMA 306, 307, 22 CMR 96. Thus, the presence or absence of an actual intention on the part of the declarant to effectuate the injury set out in the declaration does not change the elements of the offense. This is not to say the declarant's actual intention has no significance as to his guilt or innocence. A statement may declare an intention to injure and thereby ostensibly establish this element of the offense, but the declarant's true intention, the understanding of the persons to whom the statement is communicated, and the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter. United States v Humphrys, supra, page 307. Ragansky v United States, 253 Fed 643 (CA 7th Cir) (1918).

Similarly untenable is the accused's contention that the threat must be communicated to the person who is the subject of the threat. In United States v Rutherford, 4 USCMA 461, 462, 16 CMR 35, we specifically held that the requirement of communication is satisfied if the evidence shows the threat was communicated to someone, and there is "no necessity for establishing, as an essential element of the offense, that the accused communicated this determination directly to the person threatened." See also United States v Jenkins, 9 USCMA 381, 26 CMR 161; United States v O'Neal, 26 CMR 924, petition denied, 10 USCMA 668, 27 CMR 512. Occasionally, we have, as appellate counsel point out, described as an "element" of the offense the fact that the communication was "made known to the victim." United States v Davis, 6 USCMA 34, 37, 19 CMR 160; United States v Humphrys, supra, page 307. See Jeffers, "Military Offense of Communicating a Threat," Military Law Review, January 1962 (Department of the Army Pamphlet 27–100–15), pages 23 and 38. In each instance the discussion was related to the specification in issue which alleged that the communication was made to the person threatened. There is no suggestion in these discussions that the requirement of communication is broader than that delineated in the *Rutherford* case. As was observed in an earlier case, part of the "confusion [in this area] arises because counsel do not construe our language in the light of the issues confronting us in the particular cases." United States v Hazard, 8 USCMA 530, 535, 25 CMR 34, dissenting opinion by Judge Latimer. Since the specification in this case alleges, and the evidence establishes, that the threat was communicated to Mrs. Watts, the Government was not required to show that thereafter it was further communicated to the military authorities or to the persons the accused described as his "buddies" at the officers and noncommissioned officers clubs. Contrary to the accused's present contention, therefore, the law officer did not err in instructing the court-martial that such additional communication was not required. As a necessary corollary to this conclusion, it follows that the law officer was also correct in giving no instruction on whether the "victims" of the threat were put in reasonable fear of injury.

In his final assignment of error, the accused contends the law officer committed prejudicial error by denying his request for "an instruction on a disorder" as set out in "the law officers pamphlet." See Department of the Army Pamphlet No. 27–9, Military Justice Handbook: The Law Officer, April 1958, Appendix I. In presenting the request, defense counsel argued that the offense committed by the accused was "not that of communicating a threat . . . [but] a simple disorder." The argument indicated that the "offense" which counsel described as a "disorder" was ac-

tually the defense theory that the accused's statement was the disclosure of a past "completed act," not the declaration of a purpose to injure presently, or in the future. The law officer recognized the import of the defense request, and pointed out that acceptance of the defense theory of disclosure of a "completed act" would require that the accused be acquitted. He reasoned, on the same basis as defense counsel, that the accused's "mere stating" of "something that already happened" would not constitute a threat. Accordingly, he denied the request in the form in which it was presented, but indicated he would permit defense counsel to argue that the accused's statement "was not a threat," and that he would instruct the court-martial that it must find beyond a reasonable doubt that "the words . . . actually constituted" a threat.

Defense counsel did not object to the law officer's interpretation of the substance of his request and the purpose it was intended to serve. In his final argument to the court-martial, he called attention to the fact that the defense "never contested" that the telephone calls were made. He also noted that the accused had been "entirely cooperative with the CID." Then he argued at length on the real point of the defense "contention," which was that "the words used . . . did not constitute a threat" because they were merely a statement of a "completed act." Such a declaration, the defense argument continued, could be considered "a disorder of some type," but it was not the offense charged. Defense counsel concluded with a reminder to the court-martial that it must be convinced beyond a reasonable doubt that the words used were "actually a threat." These exact words were reiterated by the law officer in his instructions. He told the court-martial it must find beyond a reasonable doubt "that the words uttered to Mrs. Watts actually constituted a threat," and that to determine that issue it could consider "the words · themselves" and "all the other facts and circumstances surrounding the offense in the accused's conversation with Mrs. Watts."

**462**

Defense counsel made no objection to the instructions as given and made no claim that they did not cover adequately the theory of defense raised by the requested instruction and the evidence. We perceive no error in the law officer's interpretation of the meaning of the defense request, and his consideration of it. On the contrary, the instructions were fully in accord with what the defense wanted the court-martial to consider. If there was any other motive in the request, we are not informed of it from the record of trial or by the appellate briefs.

Unstated, but clearly apparent in appellate defense counsel's presentation, is an urgent plea for re-examination of the nature of the offense, and the severe punishment to which the offender is subject. If, as one military lawyer has suggested, commanders and prosecutors so unremittingly press charges for relatively innocuous threats as to risk substantial "unfavorable public criticism," the services perhaps ought to review the advisability of providing different punishments for different conditions of aggravation, as is the case, for example, of an unauthorized absence, and recommend to the President corresponding changes in the present limits of punishment. See Jeffers, *op cit, supra*, pages 47–49. But as far as a case before this Court is concerned, we may, as individuals, disagree with the wisdom of the prosecution, or with the particular sentence, but as Judges we are required to apply the law as it exists. United States v Holiday, supra, pages 458–459.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I have heretofore stated my belief that an ordinary threat to injure is not punishable under Uniform Code of Military Justice, Article 134, 10 USC § 934, as other, specific provisions of the Code are pre-emptive in this area. Thus, in United States v Frayer, 11 USCMA 600, 29 CMR 416, I expressed the view

that the accused's threat to injure his victim's reputation, unless the latter refrained from testifying against him in an impending investigation, should have been charged as extortion under Code, supra, Article 127, 10 USC § 927. See also United States v Sulima, 11 USCMA 630, 29 CMR 446, and United States v Holiday, 4 USCMA 454, 16 CMR 28, in which the late Judge Brosman, dissenting, aptly pointed out, at page 460, that refusal to apply the doctrine of pre-emption to threats of physical violence under Code, supra, Article 134, resulted in exactly *twelve* times as much confinement . . . [being] imposed under the Manual's Table [of Maximum Punishments] for a threat to assault as for the assault itself—and *six* times . . . [that] for the assault plus a battery."

I adhere to my former opinions in this area and disassociate myself from the rationale of my brothers. Nevertheless, I am able to join them in affirmance of the findings of guilty, for here we deal not with a pre-empted threat to injure but, as set forth in the specification, "a threat to blow up with bombs, the Fort Hood Officers Open Mess and the Fort Hood Noncommissioned Officers Open Mess." To this misconduct, clearly prejudicial to good order and discipline in the armed forces, accused judicially confessed and offered no defense, stating only that he thought of his behavior as "a practical joke." The tendency of such a "jest" to create panic and to upset the operations of a military installation is self-evident, and, in light of this record, I can only conclude that a properly instructed court reached an informed verdict in proceedings free from error.

I accordingly concur in the result reached by the majority opinion.