# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**R.Q. WARD, J.R. MCFARLANE, K.M. MCDONALD**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**DAUTHARD S. MASON**
**CORPORAL (E-4), U.S. MARINE CORPS**

**NMCCA 201300154**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 25 January 2013.
**Military Judge:** Col Daniel Daugherty, USMC.
**Convening Authority:** Commander, Marine Corps Base, Quantico, VA .
**Staff Judge Advocate's Recommendation:** Maj C.M. Hoover, USMC.
**For Appellant:** LT Jennifer Myers, JAGC, USN.
**For Appellee:** LCDR Keith Lofland, JAGC, USN; Maj David Roberts, USMC.

**30 April 2014**

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PER CURIAM:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of disobeying a lawful general order, patronizing a prostitute, adultery, and communicating a threat, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934. The

military judge sentenced the appellant to 30 months' confinement, reduction to pay-grade E-1, a dishonorable discharge, and a reprimand.  The convening authority (CA) disapproved the reprimand, approved the remaining sentence as adjudged and, except for the punitive discharge, ordered the sentence executed.  In accordance with the pretrial agreement, the CA suspended all confinement in excess of 18 months for a period of six months.

The appellant asserts three assignments of error (AOEs). First, the appellant claims that his plea to communicating a threat was improvident, because the threat "was vague and contingent" and because his statements "did not name a specific or identifiable person".[1]  Second, the appellant claims that he was subjected to unlawful post-sentence restraint that warrants relief.  Last, the appellant claims that the charges of adultery and patronizing a prostitute were unreasonably multiplied for findings.[2]  After careful consideration of the record of trial and the submissions of the parties, we are convinced that the findings and sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant occurred.  Arts. 59(a) and 66(c), UCMJ.

## Background

Over a two-month period of time, the appellant, a married Marine corporal, convinced a subordinate Marine, Lance Corporal (LCpl) L, that he intended to kill a prostitute and dispose of her body in a remote area on base.  At first, LCpl L did not believe that the appellant was serious, but a few weeks later, after the appellant began describing in detail how he intended to locate, kill, and dispose of the body, LCpl L decided to report his suspicions to his chain of command and the Naval Criminal Investigative Service (NCIS).

The first time that the appellant talked about killing a prostitute occurred when he and LCpl L were on duty.  The appellant asked LCpl L, "Do you want to kill a hooker?"  Record at 120.  The appellant did not specify or identify any particular prostitute when he asked the question.  The appellant told LCpl L that he wanted to kill a prostitute because nobody would miss her and they could take her money.  *Id*.  During this initial conversation, the appellant also suggested to LCpl L

---

[1] Appellant's Brief and Assignments of Error of 8 Nov 2013 at 1.

[2] The military judge determined, however, that the two charges were an unreasonable multiplication of charges for sentencing.  Record at 233.

that, after killing the prostitute, they could get rid of her body in one of the remote training areas on base. At the time, LCpl L thought the appellant's comments were odd, but because the appellant chuckled afterwards, he did not think these statements amounted to anything more than a weird joke.

Approximately two or three weeks later, the appellant texted LCpl L and invited him to stop by his house for dinner before LCpl L went on duty. LCpl L accepted the invitation and, soon after he arrived, the appellant showed him a suitcase and asked him whether he thought a body could fit in there. This comment raised LCpl L's suspicions that the appellant might be serious about killing a prostitute. Again, LCpl L did not report the appellant's statements because he still was not completely convinced that the appellant was serious and, therefore, did not want to get the appellant in trouble.

However, later that month, the appellant called LCpl L and told him that he was "thinking about going out and doing it tonight." *Id.* at 124. The appellant then asked LCpl L if he would open one of the gates to the training area if he showed up. LCpl L believed that the appellant intended to kill a prostitute that day and replied that he "wasn't sure . . . because if [he] would have said, Yes, [he] believe[d] that [the appellant] would've gone out and killed somebody or killed a hooker." *Id*. at 124-25. After this last conversation, LCpl L decided to inform his chain of command and NCIS because he thought that the appellant was "about 95 percent serious." *Id*. at 125. That same day, LCpl L agreed to cooperate with NCIS and engage in a pretextual phone call to the appellant.

At one point, LCpl L asked the appellant specifically how he thought they were going to proceed with the plan, to which the appellant replied that he had hoped to have done it the day before, but did not because he did not have a shovel. The appellant then conveyed to LCpl L that he would try again that Saturday afternoon or evening. The conversation continued with the two Marines describing how they would get the prostitute into the duffle bag after "tasing" her first. The appellant then told LCpl L that the "stuff" they would need to carry out the threat was already in his truck, to include: a knife, a pistol, duct tape, ammunition, and a large waterproof duffle bag. Specifically, the appellant said to LCpl L, "All the stuff is in the back of the truck. Duct tape. I've got my 45 in the back of the truck. I mean, *the first time I think, depending on what's going on Saturday, I'll just fucking shoot her and be*

3

*done with it.  One time with my .45.*"  (Emphasis added).
Prosecution Exhibit 2 at 7.

The next day, LCpl L returned to the appellant's home where the appellant showed LCpl L a stun gun and a roll of tan duct tape he claimed he would use in the abduction and killing.  The appellant also described how he intended to find the prostitute he would kill by using certain sites on the Internet.  Soon thereafter, the appellant was taken into NCIS custody and questioned.

While being questioned by NCIS, the appellant admitted to "hav[ing] hired approximately five different escorts in the last nine months"[3] who he found on-line.  When he found someone he was interested in hiring, he would contact them on a second phone he kept in his truck, and would thereafter arrange to meet somewhere in the local area.  The appellant's most recent solicitation occurred only days before his threats to LCpl L.

Additional facts necessary for the resolution of the AOEs are provided below.

## Communicating a Threat

In his first assignment of error, the appellant claims that his guilty plea to communicating a threat was improvident for two reasons.  First, he asserts that there is no evidence that the threat was made to a specific person.  Second, he asserts that the threat was equivocal, because the threat was dependent upon "what's going on Saturday."  PE 2 at 7.

This court reviews a military judge's acceptance of a guilty plea for an abuse of discretion.  *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F 2008).  In doing so, we apply the substantial basis test to determine whether "the record as a whole show[s] 'a substantial basis' in law and fact for questioning the guilty plea."  *Id.* (quoting *United States v. Prater,* 32 M.J. 433, 436 (C.M.A. 1991)).  This court will not reverse a military judge's acceptance of a guilty plea unless we find a substantial conflict between the plea, the statements of the appellant, or other evidence in the record.  *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996).

---

[3] PE 5 at 3.

Here, the appellant conveyed to LCpl L that he intended to kill a prostitute at random, but never identified any one in particular.  However, the law does not require that the potential victim be named.  The appellant must only have expressed "a present determination or intent to wrongfully injure **the person** . . . ." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 110b(1) (emphasis added).  Further, military courts and the federal courts have long accepted that a threat to harm a particular group or type of victim is sufficient.[4]  Thus, the lack of a specifically named victim does not render the appellant's guilty plea improvident.  There is ample evidence in the record to support a finding that the context of the appellant's threat to kill a prostitute, as communicated to LCpl L, would make a reasonable person believe that a prostitute at large in the local area was in danger of being harmed.

The appellant also contends that the threat he communicated to LCpl L was equivocal, because the threat was conditioned on "what's going on Saturday."  The appellant claims that because this statement lacked immediacy and was dependent on various factors, it was a conditional statement that undermines the threat declaration.[5]  We find no merit in this claim.  When analyzing whether a contingency suffices to neutralize a threat, the courts have focused primarily on whether the contingency would make a reasonable person believe that no threat existed, not whether it reduced the likelihood of the event occurring. *United States v. Shropshire*, 43 C.M.R. 214, 215-16 (C.M.A. 1971).  Also, it is well-settled that any judicial examination of threats under Article 134, UCMJ, must "pay due regard to any concretely expressed contingency associated with a threat, while remaining aware that all communication takes place within a context that can be determinative of meaning." *United States v. Brown*, 65 M.J. 227, 231 (C.A.A.F. 2007) (citing *United States v. Cotton*, 40 M.J. 93, 95 (C.M.A. 1994)).

From the record, it is clear that the appellant's reference to Saturday had only to do with his determination as to when,

---

[4] *See, e.g., United States v. Gilluly*, 32 C.M.R. 458, 460-61 (C.M.A. 1963) (holding that a threat to harm "his buddies" at the Officers' Club and the NCO Club were sufficient to identify the potential victims of his threat). We are also persuaded by a recent federal case wherein the 3d Circuit Court of Appeals held that the appellant's statements threatening a "kindergarten class," the "State Police" and the "Sheriff's Department" sufficed to communicate a threat, despite not naming a specific person or child. *United States v. Elonis*, 730 F.3d 321, 334-35 (3d Cir. 2013).

[5] Appellant's Brief at 12.

not if, he would try to execute his plan to kill a prostitute. The appellant's guilty pleas, stipulation of fact, and the recorded conversations between the appellant and LCpl L support this conclusion. Moreover, when we consider the preparatory steps demonstrated by the appellant, such as: obtaining a suitcase; procuring a waterproof bag; storing a stun gun, rope and pistol in his vehicle; and devising a means to dispose of the body on base, we are satisfied that the threat was still reasonably perceived to exist and was not neutralized. Accordingly, we find no substantial basis on law or fact to question the appellant's guilty plea. *Inabinnette*, 66 M.J. at 322.

### Imposition of Post-Sentence Restraint

In his second assignment of error, the appellant alleges through his post-trial affidavit that the restrictions placed on him after his release from the brig amounted to unlawful punishment that warrants relief. We disagree.

After completing his sentence of confinement, the appellant was released from the brig and assigned to a base command for approximately 18 days to allow for the processing of his appellate leave paperwork. In a post-trial affidavit, he alleges that he was mistreated by his command because he could not leave base for the first week, was prohibited from drinking alcohol, and required an escort when he went anywhere on base. The appellant was also required to check-in three times a day for accountability purposes. Once granted permission to leave base in his second week, he complains that he was required to call and check in with his unit twice daily. The appellant further states that when he asked to call his trial defense attorney regarding his appellate leave paperwork, the company commander remained in the room while the call was being made and that this affected his ability to candidly communicate with his counsel. The appellant claims that his command warned him that if failed to follow these orders he "would be charged and sent back to the brig."[6]

We are not persuaded by the appellant's assertions that any of the treatment complained of, if true, amounts to unlawful punishment. First, RULE FOR COURT-MARTIAL 304(h), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), recognizes that restraint is permissible for administrative purposes. Administrative

---

[6] Appellant's Motion to Attach of 8 Nov 2013, Post-Trial Affidavit dated 4 Nov 2013 at 1.

restriction is authorized even after a service member has fully served his confinement and is pending appellate review process. *Reed v. Ohman*, 41 C.M.R. 110, 113 (C.M.A. 1969).  Second, assuming that all facts contained in the appellant's affidavit are true, we are hard-pressed to find that any of the conditions placed on him during this 18-day period extended beyond what was necessary to ensure his accountability before he was ordered onto appellate leave.  Since the conditions placed on the appellant were administrative in nature and served legitimate command objectives of accountability, we find no merit to this assignment of error.

**Unreasonable Multiplication of Charges (UMC) for Findings**

In his final assignment of error, the appellant claims that the Government unreasonably multiplied the charges of adultery and patronizing a prostitute because both offenses arose out of the same act.  He further claims that the military judge's failure to dismiss the adultery charge stemming from this act amounts to an abuse of discretion.[7]  We disagree.

In addition to his other pleas of guilty, the appellant entered unconditional pleas of guilty to one specification of adultery and one specification of patronizing a prostitute. After the military judge accepted the appellant's guilty pleas, but before sentencing, the military judge granted trial defense counsel's motion to merge these two charges for sentencing purposes.  Record at 116, 232-33.  Notably, trial defense counsel did not assert at trial that there was UMC for findings.

In determining whether UMC exists, this court considers five factors: (1) Did the accused object at trial; (2) Are the charges aimed at distinctly separate criminal acts; (3) Do the charges misrepresent or exaggerate the acts; (4) Do the charges unreasonably increase the appellant's punitive exposure; and (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges and specifications? *United States v. Quiroz*, 57 M.J. 583, 585-86 (N.M.Ct.Crim.App. 2002) (*en banc*), *aff'd*, 58 M.J. 183 (C.A.A.F. 2003) (summary disposition).

---

[7]  "A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion." *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citing, *United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004) (additional citation omitted).  We leave for another day whether the appellant's objection at trial "to merge Charge III, Specification 1, and the Additional Charge I and Specification for purposes of sentencing" (Record at 116) also preserves the issue of UMC for findings post-*Campbell.*

The first *Quiroz* factor weighs against the appellant. Here, trial defense counsel raised UMC for sentencing, but did not object to UMC for findings, a distinct basis for relief.

The second and third factors also weigh against the appellant since the two charges were aimed at distinctly different criminal acts – the adultery charge was aimed at addressing the appellant's unlawful extramarital sexual conduct, while the patronizing a prostitute charge was aimed at the unlawful exchange of money for sex with someone to whom the appellant was not married. Thus, this charging scheme does not misrepresent or exaggerate his criminality.

The fourth factor weighs against the appellant in that the military judge merged the two specifications for sentencing.

The fifth factor also weighs against the appellant. There is no evidence of prosecutorial overreaching or abuse in the drafting and charging of the two offenses. In fact, within a range of charging options, the Government chose to only charge the appellant with one specification of adultery and one specification of procuring a prostitute even though the evidence supported charging the appellant with multiple occasions of both offenses.[8]

We find that all of the *Quiroz* factors clearly weigh against the appellant. Accordingly, we hold that the military judge did not abuse his discretion by merging the specifications for sentencing, but allowing the convictions to stand.

## Conclusion

The findings and the sentence as approved by the CA are affirmed.

For the Court

R.H. TROIDL
Clerk of Court

---

[8] The appellant admitted to at least five occasions where he had sexual intercourse with a prostitute he patronized, while married. Record at 94-95.