# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

No. 201500381

_____

## UNITED STATES OF AMERICA
Appellee

v.

## ALEXEY N. GEBERT
Seaman (E-3), U.S. Navy
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Arthur L. Gaston III, JAGC, USN.
For Appellant: Samuel C. Moore, Civilian Appellate Counsel;
Lieutenant Rachel E. Weidemann, JAGC USN.
For Appellee: Captain Cory A. Carver, USMC; Lieutenant Robert
J. Miller, JAGC, USN.

_____

Decided 15 November 2016

_____

Before CAMPBELL, RUGH, and HUTCHISON, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

RUGH, Judge:

A military judge sitting as a general court-martial convicted the appellant contrary to his plea of one specification of communicating a bomb threat,[1] in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (2012). The military judge sentenced the

---

[1] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 109 is formally titled *Threat or hoax designed or intended to cause panic or public fear*. For ease of reference, we will refer to ¶ 109(b)(1) as *Communicating a Bomb Threat*.

appellant to seven months' confinement, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant now raises five assignments of error (AOE):  (1) that the military judge erred by requiring the government prove only a *mens rea* standard of recklessness for the offense of communicating a bomb threat; (2) that the evidence was legally and factually insufficient; (3) that the charge and specification were improperly referred to general court-martial;  (4) that the military judge abused his discretion by admitting certain prosecution exhibits; and (5) that the military judge abused his discretion in crafting his remedy to a government violation of an evidentiary notice requirement.[2]

Having carefully considered the record of trial, the pleadings, and the oral argument on the first and second AOE, we find no error materially prejudicial to a substantial right of the appellant.

## I. BACKGROUND

In the spring of 2015, the appellant was assigned to the Engineering Repair Division (ER09) on board USS PORT ROYAL (CG 73) home ported at Pearl Harbor, Hawaii. ER09 maintained the ship's many damage control systems, which included fire extinguishers, water-tight doors, and ventilations systems, but was more infamously referred to as "the island of misfit toys." Similarly disparaged, USS PORT ROYAL was an aging cruiser that seldom deployed and was often in need of repair—always a bridesmaid, yet never the bride when it came time for early decommissioning. As a result, morale onboard was low, and crew members often wished the ship would sink, run aground, or otherwise stop working.

Nestled within this doubly-troubled environment, the appellant—a young, Russian emigrant with career aspirations that included the Explosive Ordinance Disposal (EOD) program—became disenchanted with his life on the ship.

On 29 April 2015, the appellant, Petty Officer Third Class (PO3) Sierra,[3] and PO3 Lima were working in the ER09 work center when they heard that a barracks room inspection was underway. Based on

---

[2] AOE (5) was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] Pseudonyms have replaced all surnames referenced in the opinion.

prior interactions with the appellant, PO3 Sierra asked him "[d]o you have any bomb-making materials in [your] room?"[4] The appellant responded, "No, they're far, far away[.]"[5] PO3 Sierra then turned to PO3 Lima and intoned in a "dead serious" manner that appellant was "building a bomb."[6] The appellant, within earshot, did not respond.

The next day, PO3 Lima asked PO3 Sierra if he knew where the appellant intended to use the bomb he was building. PO3 Sierra replied that he believed the appellant "intend[ed] to use it on the ship."[7] PO3 Sierra also stated that the appellant kept the bomb in a Pelican case, a specific brand of molded-plastic case that the appellant retrieved several days earlier from the ship's refuse.[8]

Concerned, PO3 Lima reported this information to his chain of command that day.

The next morning, 1 May 2015, PO3 Lima was alone with the appellant during cleaning stations. PO3 Lima raised the topic of the Pelican case and asked if the case was safe. The appellant replied that it was "hidden."[9] PO3 Lima then asked "what [the appellant's] purpose behind it was," and the appellant responded, "it was to cripple or damage" or sink the ship to prevent it from getting underway.[10] PO3 Lima asked where the appellant planned to use it, and the appellant responded "possibly the main reduction gear on board or the sonar dome," despite recognizing that human casualties would be inevitable.[11] Referring to the items held in the Pelican case, the appellant said that if an explosion occurred, he would blame it on civilian contractors.

---

[4] Record at 295, 307.

[5] *Id*. at 295.

[6] *Id*. at 220-21, 233, 236.

[7] *Id*. at 221.

[8] At the time it was retrieved, PO3 Sierra inquired into what the appellant planned to do with the Pelican case, to which the appellant casually responded, "[i]t's the case I'm going to build a bomb in." *Id.* at 296, 310-11. PO3 Sierra was unconcerned with this comment at the time, thinking this was just "Gebert being Gebert." *Id*. at 309-11.

[9] *Id*. at 223, 228, 239.

[10] *Id*. at 224, 228, 251.

[11] *Id*. at 224-25, 228-29, 240-41.

During this conversation, the appellant's apparent mood was humorless—"there was no laughing about it, no joking about it, all very serious;"[12] his tone was "very serious;"[13] and he was "very serious in everything he said."[14] He did not laugh. "[W]henever people would pass by doing their roves" or walk in or out of the ER09 work center, the appellant "would stop talking about it and [only] continue on once they were out of earshot[,]" as if the conversation was a secret.[15]

However, during this conversation the appellant never used the words "bomb" or "explosive" or stated the exact contents of the case. The appellant also never stated when, if at all, he would plant the case and its contents on the ship.

Before the conversation was over, both the appellant and PO3 Lima were interrupted by authorities and escorted away for interviews based on PO3 Lima's report the evening before. By noon the ship was evacuated, but authorities did not find the Pelican case or a bomb onboard.

In his interview with investigators, the appellant admitted that he was attempting to build a bomb from ammonium nitrate, something he had successfully accomplished twice before joining the Navy, for detonation at a deserted location somewhere on the island of Oahu. Shipmates also reported that the appellant often made comments about "blowing up" the ship and discussed using metal plates and copper wiring to construct an armor-piercing bomb that could penetrate the ship's hull.

A search of the appellant's barracks room resulted in the seizure of a bag and several bundles of copper wiring, pliers and wire stripping tools, a metal plate, and a plastic baggie of fertilizer.[16] The search also uncovered printed instructions on manufacturing ammonium nitrate explosives, on the production of chlorine and hydrogen gas, and on the structure of clandestine terrorist cells. Authorities also retrieved the

---

[12] *Id.* at 226.

[13] *Id.*

[14] *Id.* at 225.

[15] *Id.* at 225-26.

[16] The appellant claimed that he originally purchased the fertilizer for use in a terrarium. Investigators later determined that the amount and quality of the fertilizer seized was insufficient for building an ammonium nitrate-based bomb.

4

appellant's notebooks containing notes on the ingredients of an ammonium nitrate fuel air bomb, shaped charges, and pipe bombs.

Portentously, within the appellant's handwritten notes was also a short comment directed at his Leading Chief Petty Officer:

> Most of the time she thinks I'm not being serious. Its not me cracking jokes but saying what I'm think[ing] out loud . . . .[17]

## II. DISCUSSION

### A. The required *mens rea* for communicating a bomb threat

As we have previously articulated, "[s]pecial findings are to a bench trial as instructions are to a trial before members." *United States v. Postle*, 20 M.J. 632, 638 (N.M.C.M.R. 1985).[18] Questions pertaining to the substance of a military judge's instructions and those involving statutory interpretation are reviewed *de novo. United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F. 2008); *United States v. Smith*, 50 M.J. 451, 455 (C.A.A.F. 1999). We evaluate a military judge's instructions "'in the context of the overall message conveyed[.]'" *United States v. Prather,* 69 M.J. 338, 344 (C.A.A.F. 2011) (quoting *Humanik v. Beyer*, 871 F.2d 432, 441 (3d Cir. 1989)).[19]

At trial the appellant was charged with wrongfully communicating a bomb threat to PO3 Lima in violation of Article 134, UCMJ, MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 109(b)). After findings, the appellant requested the military judge enter special findings pursuant to RULE FOR COURTS-MARTIAL (R.C.M.) 918(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).[20]

In his special findings, the military judge affirmed that he found the appellant guilty beyond reasonable doubt of each element of the specification of the Charge, as follows:

---

[17] Prosecution Exhibit 5 at 35.

[18] *See also United States v. Zambrano*, No. 201500002, 2016 CCA LEXIS 19, at *7, unpublished op. (N-M. Ct. Crim. App. 19 Jan 2016).

[19] *See also United States v. Maxwell,* 45 M.J. 406, 424 (C.A.A.F. 1996) (assessing the military judge's instructions "as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence") (quoting *United States v. Snow*, 82 F.3d 935, 938-39 (10th Cir. 1996)).

[20] Appellate Exhibit (AE) XXXVII.

a. That onboard USS PORT ROYAL (CG 73), on or about 1 May 2015, the [appellant] communicated certain language to [PO3 Lima], to wit: "I intend to place a bomb somewhere on USS PORT ROYAL where it would do the most damage to cripple or sink the ship, probably the main reduction gear," or words to that effect;

b. That the language communicated amounted to a threat;

c. That the harm threatened was to be done by means of an explosive;

d. That the communication was wrongful;

e. That, under the circumstances, the conduct of the [appellant] was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.[21]

At defense's request, the military judge then provided an exhaustive list of the relevant evidence supporting that the communication was threatening, wrongful, prejudicial to good order and discipline, and service discrediting.

The military judge then outlined his legal theory as to the *mens rea* standard required to find that the appellant's communication was *wrongful* pursuant to the fourth element—that is, that it was at a level "sufficient 'to separate wrongful conduct from otherwise innocent conduct.'"[22] In doing so, he first quoted the Court of Military Appeals' holding in *United States v. Gilluly*, that "[t]he surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter."[23] 32 C.M.R. 458, 461 (C.M.A. 1963). He then linked this language with MCM Part IV, ¶ 110(c) affirming that "a declaration made under circumstances which reveal it to be in jest or for an innocent or legitimate purpose, or which contradict the expressed intent to commit the act, does not constitute this offense."

Finally, after reviewing the Supreme Court's reasoning in *Elonis v. United States*,[24] the military judge was persuaded that "the *mens rea*

---

[21] AE XLII at 1.

[22] *Id.* at 9 (quoting *Elonis v. United States*, 575 U.S. __, 135 S. Ct. 2001, 2010 (2015)).

[23] *Id.* at 8.

[24] 135 S. Ct. at 2010.

standard applicable in [the appellant's] case [was] that of recklessness."[25] The military judge intoned that he was convinced of this standard in part by the unique character of the military community and mission where "operations, proximity to and accessibility of explosive material, and maintaining good order and discipline . . . support proscribing such threats at the lowest possible level of criminal intent."[26]

However, the military judge also affirmed that the evidence supported finding that the appellant was "consciously aware that his statements would be taken seriously."[27] The military judge summarized that "the weight of the evidence supports beyond a reasonable doubt that the [appellant] was not operating under some mistaken belief that he would be perceived as joking," and that "particularly in light of the surrounding circumstances, the evidence supports that the [appellant's] communication of a threat was knowing and intentional."[28]

The appellant now contends that the military judge's special findings are inconsistent with the Court of Appeals for the Armed Forces' (CAAF) recent decision in *United States v. Rapert*, 75 M.J. 164 (C.A.A.F. 2016). We disagree.

In *Rapert*, the CAAF evaluated the offense of *Communicating a Threat* under Article 134, UCMJ, MCM, Part IV, ¶ 110, in light of the Supreme Court's opinion in *Elonis* (supra). After holding that the case was "beyond the reach of *Elonis*," *Rapert*, 75 M.J. at 168, the CAAF clarified that the offense contained both an objective and a subjective element.

The objective notion of a threat referred only to the first element of the offense, to wit: "that the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property or reputation of another person, presently or in the future[.]"[29] When analyzing whether a communication constituted a threat under the first element, "'the existence of a threat should be

---

[25] AE XLII at 9.

[26] *Id.* at 10.

[27] *Id.* at 12.

[28] *Id.* at 12. 12 n.1.

[29] MCM, Part IV, ¶ 110(b)(1). Of note, the first element of *Communicating a Threat* combines the *first two* elements of the sister offense of *Communicating a Bomb Threat* under ¶ 109.

7

evaluated from the point of view of a reasonable [person].'" *Rapert*, 75 M.J. at 168 (quoting *United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995)) (aleration in original).

The subjective notion of a threat referred to the third element of the offense, to wit: "that the communication was wrongful."[30] This required that "the Government prove that an accused's statement was wrongful because it was not made in jest or as idle banter, or for an innocent or legitimate purpose . . . and thus require[d] the Government to prove the accused's *mens rea* rather than base a conviction on mere negligence." *Id.* at 169. "Importantly, however, intent in this context is not akin to the speaker's subjective intent to *execute* the threat; instead, this aspect of intent relates to whether the speaker intended his or her words *to be understood as sincere.*" *Id.* at n.10.

The Court then proposed for clarity's sake that the third element[31] of the offense should be considered to read as follows:

> That the communication was wrongful [in that the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose].

*Id.* at 169 (brackets in original).

Restated, the Manual establishes a floor for culpability requiring proof of criminal intent greater than mere negligence, and that floor requires proof that the offender didn't intend his statements to be a joke, in jest, or as idle banter, or to serve some other innocent or legitimate purpose.

Still, how this intention equates to more traditional articulations of *mens rea,* like a purposeful, knowing, or reckless intent, has been left relatively opaque.[32] Regardless, its opacity isn't dispositive in this case.

---

[30] MCM, Part IV, ¶ 110(b)(3). This element is directly analogous to the fourth element of *Communicating a Bomb Threat* under ¶109.

[31] Or the fourth element of the analogous offense of *Communicating a Bomb Threat*.

[32] Of note, on 20 May 2016 Executive Order No. 13,730, 81 Fed. Reg. 33,331, 33,358, amended Part IV, ¶ 110(c) of the MCM to provide:

> [T]o establish that the communication was wrongful it is necessary that the accused transmitted the communication for the purpose of issuing a threat, with the knowledge that the communication would be viewed as a threat, or acted recklessly with regard to whether the communication would be viewed as a threat.

Even if the "more than a joke/less than execution" standard forecloses application of the traditional recklessness level of *mens rea*, we find its use in this case harmless beyond reasonable doubt.

Instructions that lower the required level of *mens rea* implicate fundamental conceptions of justice under the Due Process Clause.[33] "If instructional error is found [when] there are constitutional dimensions at play, [the appellant's] claims 'must be tested for prejudice under the standard of harmless beyond a reasonable doubt.'" *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (quoting *United States v. Kreutzer*, 61 M.J. 293, 298 (C.A.A.F. 2005)).

"'The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is 'whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence.'" *Id.* (quoting *United States v. Kaiser,* 58 M.J. 146, 149 (C,A,A,F, 2003))). "If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The question is not merely whether, without the error, there remains sufficient evidence to support the verdict. Instead, the court must determine whether the military judge's verdict was "substantially swayed by the error." *United States v. Rhodes*, 61 M.J. 445, 453 (C.A.A.F. 2005).

Here, within the context of "the overall message conveyed,"[34] we find the possible error in the military judge's special findings harmless beyond reasonable doubt.

Of singular importance to this determination is the military judge's wise inclusion in his special findings that the evidence established "an awareness of wrongdoing on the part of the accused in communicating the threat that *more than* satisfies the recklessness standard."[35] Despite determining that he must only find proof of reckless intent, the military judge further found that the appellant was "consciously aware that his statements would be taken seriously[.]"[36] He also found the

*See also* ¶ 109, Threat or hoax designed or intended to cause panic or public fear.

[33] *See United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016) ("[T]he risk that the members would apply an impermissibly low standard of proof, undermin[es] both the presumption of innocence and the requirement that the prosecution prove guilt beyond a reasonable doubt . . . .") (citation and internal quotation marks omitted).

[34] *Prather,* 69 M.J. at 344.

[35] AE XLII at 12 (emphasis added).

[36] *Id.*

evidence established that the communication of the threat was "knowing and intentional."[37] As a result, the military judge clearly determined that the appellant intended his avowal to bomb the USS PORT ROYAL to be understood as a sincere threat and not as a joke or idle banter. As such, we are convinced beyond reasonable doubt that any error did not contribute to the appellant's conviction.

## B. Legal and factual sufficiency[38]

We review questions of factual and legal sufficiency *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citations and internal quotation marks omitted). In weighing questions of legal sufficiency, the court is "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

While the military judge already provided an exhaustive list of the relevant evidence supporting the legal and factual sufficiency of the appellant's conviction, we will again summarize some of the most persuasive facts here.[39]

First, the appellant's threats to PO3 Lima on 1 May 2015 were extremely detailed. He stated that the Pelican case would be placed onboard the ship in a location where it would cripple, damage, or sink

---

[37] *Id.* at n.1 While the military judge specifically stated that "the evidence supports" a knowing and intelligent communication of a threat, his use of the word "support" elsewhere in his special findings makes it clear in context that he intended the word to convey a finding of guilt on the matter beyond reasonable doubt. *See, e.g. id.* at 12 ("In sum, the weight of the evidence supports beyond a reasonable doubt that the accused was not operating under some mistaken belief that he would be perceived as joking but was inadvertently taken seriously.")

[38] Raised as AOE (2)

[39] *See* AE XLII.

the ship, such as the main reduction gear or the sonar dome. He expressed the expectation that human casualties were inevitable, and he described a means for avoiding blame by implicating civilian contractors who had access to the ship.

Second, the appellant communicated these threats in a serious tone and with a serious demeanor. He didn't laugh, smile, or express these threats under circumstances that would indicate he intended them in jest. When others came close, he would whisper as if he intended his statements to be secret. Afterwards, when confronted by investigators, the appellant initially denied possessing the Pelican case, and falsely claimed he printed articles about clandestine terrorist cells for a homework assignment before entering the Navy.

Additionally, although an actual intent "on the part of the declarant to effectuate the injury set out in the declaration" is not a required element of the offense, it may be relevant in determining the true intent of the declarant in making the threat. *Gilluly*, 32 C.M.R. at 461. Here, the appellant began by expressing an interest in building an ammonium nitrate bomb. He discussed with others the relative merits of placing explosives near the ship's hull, in the main engine room, or in the sonar dome, and he surreptitiously researched related articles on public computers to avoid detection. He then set about to amass the instrumentalities of a bomb: instructions on types of explosives and explosive devices; copper wiring, a carbon dioxide cartridge, fertilizer, and a metal plate; and a case for containing and transporting a bomb.[40]

Finally, the appellant's statements were made onboard ship to a more senior Sailor (albeit, only one pay grade senior) who took them as a serious threat. But for already reporting his concerns to the chain of command the day before, PO3 Lima would have reported the appellant's more clearly articulated threats immediately.[41] Regardless, the ship was shortly thereafter evacuated. While the evacuation was not the direct result of the appellant's 1 May 2015 threat, we agree with the military judge who adroitly observed:

> [A] Naval warship [need not] be evacuated twice in order
> to demonstrate the direct and obvious injury to good order

---

[40] The appellant told investigators he planned to detonate the bomb in an unpopulated area.

[41] *See* Record at 246 ("Q: And you were asked something along the lines of, you know, did you immediately report it to the chain of command . . . ? A: I did not, Your Honor, as I had already portrayed [sic] my information from before about him possibly having a bomb or a device.").

and discipline caused by one of its [S]ailors telling another [S]ailor onboard his detailed intent to place a bomb on the ship.[42]

Further, it is clear from the circumstances that the appellant's conduct would tend to bring discredit on the armed forces if it were made known to the public, as articulated by the military judge in his special findings,[43] more than satisfying the low evidentiary threshold required to satisfy both clauses of the fifth element correctly.[44]

Considering the above, we find the evidence legally sufficient to support the appellant's conviction. Likewise, after weighing the evidence and making allowances for not having observed the witnesses, we are convinced beyond reasonable doubt of the appellant's guilt.

## C. Improper referral[45]

Initially, the appellant was also charged with larceny of numerous pistol ammunition magazines in violation of Article 121, UCMJ, 10 U.S.C. § 921 (2012). Subsequent to a hearing held pursuant to Article 32, UCMJ, the preliminary hearing officer found probable cause to support the allegation of communicating a bomb threat, but did not find probable cause to support the larceny of the magazines. In her report of 22 June 2015, the hearing officer marked a block on the standardized form indicating that the offense was not supported by probable cause. However, she subsequently explained the dichotomy of her determinations—probable cause to support the allegation of communicating a bomb threat but no probable cause to support the allegation of larceny of pistol magazines—in her written report attached to the standard form.

After receiving the preliminary hearing report, the staff judge advocate (SJA) prepared written advice for the CA pursuant to Article 34, UCMJ. Therein, the SJA omitted reference to the hearing officer's findings on probable cause and recommended referral of all charges to

---

[42] AE XLII at 7.

[43] *Id.*

[44] *See United States v. Goings*, 72 M.J. 202, 206 n.5 (C.A.A.F. 2013) (summarizing CAAF's *juris prudence* regarding the sufficiency of evidence required to prove the terminal element of Article 134, UCMJ).

[45] Raised as AOE (3).

general court-martial. Both the larceny charge and the communicating a bomb threat charge were referred to general court-martial on 1 July 2015.

At trial, the defense moved to dismiss the larceny charge due to an improper referral based in part on the omission of the probable cause recommendation from the SJA's Article 34, UCMJ, advice. The military judge agreed that the SJA's advice was materially defective and ordered the SJA to prepare and serve on the CA new advice remedying the omission. The new Article 34, UCMJ, advice was provided on 23 July 2015.[46] Subsequently, and in accordance with both the preliminary hearing officer's recommendation and the new Article 34, UCMJ, advice, the CA withdrew and dismissed the larceny charge prior to the introduction of evidence on the merits.

The appellant now asserts that the charge of communicating a bomb threat was improperly referred to general court-marital. Whether a charge has been properly referred is a jurisdictional question we review *de novo. United States v. Ballan*, 71 M.J. 28, 32 (C.A.A.F. 2012).

While we disagree with the appellant's assertion that the preliminary hearing officer's recommendation on probable cause is somehow binding on the SJA or CA, we find it unnecessary to address that errant belief here.[47] Instead, it is sufficient to identify that the preliminary hearing officer's report found probable cause to support the allegation of communicating a bomb threat. This recommendation was provided to the SJA who concurred in the new Article 34 advice, concluding that the specification for communicating a bomb threat was in the proper form, the specification alleged an offense under the UCMJ, the allegation of the communicating a bomb threat offense was warranted by evidence indicated in the preliminary hearing officer's report, and a court-martial would have jurisdiction over the

---

[46] AE XXIII.

[47] *See United States v. Meador*, 75 M.J. 682, 683 (C.G. Ct. Crim. App. 2016) ("There is nothing in this statutory scheme that makes a determination of probable cause by the PHO [preliminary hearing officer] a precondition of referral to a general court-martial, nor is there any language making the PHO's determination binding on the SJA or the CA."). We also find no support for the appellant's assertion that the originally defective Article 34, UCMJ, advice in some way "baked" prejudice into the process that wasn't remedied by the issuance of new advice. *See* Appellant's Brief and Assignment of Errors of 29 Apr 2016 at 25.

appellant.[48] This is all that is required by Article 34, UCMJ, and the relevant rules for court-martial as to that specific offense.

Regardless, even if the advice provided on the specification for communicating a bomb threat was deficient, we find no prejudice from what would comprise a non-jurisdictional, procedural error—particularly given the steps taken by the military judge pursuant to R.C.M. 906 to remedy other deficiencies extant in the original pretrial advice related to the larceny offense.[49]

## D. Admission of prosecution exhibits[50]

Prior to trial, the government sought a preliminary ruling on the admissibility of various items of evidence under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 404(b), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Specifically, trial counsel sought to introduce the following exhibits:

> Prosecution Exhibit 4, selected pages from a green, "Rite in the Rain" all-weather notebook found on the appellant;[51]

> Prosecution Exhibit 5, selected pages from another green, "Rite in the Rain" all-weather notebook;[52]

> Prosecution Exhibit 16, a print-out of an internet article on "Clandestine cell system" found on the appellant;

> Prosecution Exhibit 17, selected pages from a white binder found abandoned on the ship but later identified by the appellant as belonging to him;[53]

---

[48] *Id.* at 3.

[49] *See United States v. Winiecki*, No. 201600031, 2016 CCA LEXIS 572, at *2 n.1, unpublished op. (N-M. Ct. Crim. App., 29 Sep. 2016) (characterizing discrepancies in the Article 34, UCMJ, advice as "non-jurisdictional, procedural errors").

[50] Raised as AOE (4).

[51] The government sought admission of nine pages from this green notebook which contained handwritten notes of the appellant discussing bomb ingredients, bomb and explosives characteristics, subversive organizations, and responses to attacks on the U.S. government.

[52] The government sought admission of three pages from this green notebook which contained handwritten notes of the appellant discussing bomb materials, types of bombs, hostage control, and his personal state of mind.

Prosecution Exhibit 18, a large baggie of fertilizer seized from the appellant's barracks;

Prosecution Exhibit 19, washing machine motors containing copper wire seized from the appellant's barracks;

Prosecution Exhibit 20, various bundles of wires seized from the appellant's barracks;

Prosecution Exhibit 21, wire cutting and stripping tools seized from the appellant's barracks; and

Prosecution Exhibit 22, a gray cloth seized from the appellant's barracks.

The Government sought to introduce these items as proof of the appellant's intent and opportunity to actually build a bomb as relevant to the appellant's subjective intent to communicate a threat to PO3 Lima.

During argument, defense counsel conceded that Prosecution Exhibit 18 could be admissible for some purpose under MIL. R. EVID. 404(b).[54] Defense counsel also agreed with the military judge that evidence concerning whether the appellant had the intent to actually make a bomb would be relevant "for purposes of determining whether [he] had the intent to make a threat[.]"[55]

Subsequently, the military judge issued a written ruling applying the three-part test for admissibility of evidence of uncharged misconduct offered under MIL. R. EVID. 404(b) established in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989), and determined that the items were admissible to show that the appellant "was either intending to or in the process of building an explosive device at or around the time he made the statements" to PO3 Lima.[56] For this reason, the evidence tended to bear on the appellant's true intent in making the threat.

---

[53] The government sought admission of twenty-two pages from this white binder which contained handwritten notes and computer print-outs about bomb construction, nitroglycerine, and the EOD program.

[54] Record at 118.

[55] *Id.* at 95.

[56] *Id.* at 562.

As a result of this preliminary ruling, the defense requested and the military judge granted admission of the complete white binder (Prosecution Exhibit 17) and green notebooks (Prosecution Exhibits 4 and 5) pursuant to MIL. R. EVID. 106. The appellant now avers that the military judge abused his discretion in admitting Prosecution Exhibits 4, 5, and 16 through 22.

While "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" it may be admissible to prove, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MIL. R. EVID. 404(b)(1) and (2). Evidence of this type must be offered for a proper purpose other than to demonstrate the propensity of an accused to commit the crimes charged. *United States v. Acton*, 38 M.J. 330, 333 (C.M.A. 1993) (citing *United States v. Castillo*, 29 M.J. 145, 150 (C.M.A. 1989).

In order to admit evidence of uncharged misconduct under MIL. R. EVID. 404(b): (1) the evidence must reasonably support a finding that the accused committed the uncharged misconduct; (2) a material fact in issue must be made more or less probable by the evidence; (3) the danger of unfair prejudice must not substantially outweigh the probative value of the evidence. *Reynolds*, 29 M.J. at 109.

We review a military judge's evidentiary rulings for an abuse of discretion, that is, whether the "challenged action [is] arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation and internal quotation marks omitted). Further, "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

Here, the military judge admitted the prosecution exhibits only after applying the *Reynolds* test, finding the evidence legally relevant, and determining its probative value was not substantially outweighed by the danger of unfair prejudice.[57] Particularly given that this was a judge-alone trial, we find that the military judge did not abuse his discretion in admitting the evidence as proof of intent and opportunity, and further conclude that the military judge appropriately limited his consideration of the evidence to its proper uses.

---

[57] AE XXVIII at 6.

16

### E. Untimely notice remedy[58]

The appellant's fifth AOE involves the military judge's choice of remedy—a one-day continuance—in response to untimely notice by the Government under MIL. R. EVID. 304 regarding the statements of two witnesses. We have fully considered this issue and find it without merit. *United States v. Clifton,* 35 M.J. 79 (C.M.A. 1992).

### III. CONCLUSION

The findings and the sentence, as approved by the CA, are affirmed.

Senior Judge CAMPBELL and Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court

---

[58] Raised as AOE (5).