# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 40298**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Terry L. PITTMAN III**
Senior Airman (E-4), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary[1]

Decided 22 April 2024

––––––––––––––––––

*Military Judge*: Christina M. Jimenez (pretrial motions and arraignment); Dayle P. Percle.

*Sentence*: Sentence adjudged 19 April 2022 by GCM convened at Malmstrom Air Force Base, Montana. Sentence entered by military judge on 9 May 2022: Confinement for 8 months, reduction to E-1, and a reprimand.

*For Appellant*: Colonel Anthony D. Ortiz, USAF; Major Jenna M. Arroyo, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major Olivia B. Hoff, USAF; Captain Kate E. Lee, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and MENDELSON, *Appellate Military Judges*.

Judge MENDELSON delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge GRUEN joined.

––––––––––––––––––

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial*, *United States* (2019 ed.) (2019 *MCM*), having been sentenced to more than six months' confinement.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

MENDELSON, Judge:

A general court-martial comprised of a military judge sitting alone convicted Appellant, contrary to his pleas, of two specifications of assault, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928; one specification of making a false official statement, in violation of Article 107, UCMJ, 10 U.S.C. § 907; and one specification of communicating a threat, in violation of Article 115, UCMJ, 10 U.S.C. § 915.[2] The military judge sentenced Appellant to eight months of confinement, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant raises several assignments of error, which we have rephrased and reordered as follows: (1) whether Article 115, UCMJ, is unconstitutionally vague, or the charged Article 115, UCMJ, specification fails to state an offense; (2) whether Appellant's conviction for the Article 115, UCMJ, specification is legally and factually sufficient; and (3) whether Appellant was denied his right to a speedy trial under Rule for Courts-Martial (R.C.M.) 707 or the Sixth Amendment.[3] We also considered an additional issue, not raised by Appellant, that was identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (4) whether Appellant is entitled to relief for facially unreasonable appellate delay in accordance with *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). Additionally, we have identified an error in the entry of judgment (EoJ), which we correct in our decree. We find no error materially prejudicial to Appellant's substantial rights occurred and affirm the findings and sentence.

## I. BACKGROUND

Appellant's fiancée sent him a text message claiming she had been raped by TLP, an active duty Airman.[4] After receiving the text message, Appellant told two of his friends that he wanted to confront TLP, and the three drove to the parking lot outside of TLP's dorm room. Appellant called TLP from the

---

[2] Unless otherwise specified, all references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the 2019 *MCM*.

[3] U.S. CONST. amend. VI.

[4] TLP testified at trial that he did not sexually assault Appellant's fiancée and was not facing court-martial charges for the alleged offense.

parking lot and told him that he needed help with a broken-down car, as a ruse to get TLP to come outside. Once TLP walked into the parking lot, Appellant confronted him by asking if he knew his fiancée. When TLP denied knowing Appellant's fiancée, Appellant became angry and pulled a handgun from his waistband, sliding the action of the gun back as if to charge a round in the chamber.[5] According to TLP's testimony, upon seeing the gun he asked Appellant whether he was going to shoot him. Appellant responded "yes." TLP replied that Appellant should "go ahead and shoot" him, and Appellant told TLP to get on his knees and beg for mercy. When TLP refused, Appellant hit TLP on the back of the head with the gun.

## II. DISCUSSION

### A. Constitutional Challenges

Appellant contends, for the first time on appeal, that Article 115, UCMJ, is unconstitutionally vague on its face, or in the alternative that the charged Article 115, UCMJ, specification fails to state an offense, because the requisite mens rea is not specified. We are not persuaded and find no relief is warranted.

#### 1. Law

##### a. Standard of Review

We review the constitutionality of a statute de novo. *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012) (citing *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005)). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Likewise, whether a specification fails to state an offense is a question of law that we review de novo. *United States v. Turner*, 79 M.J. 401, 404 (C.A.A.F. 2020) (citation omitted). "Although a claim that a specification fails to state an offense may be made at any time, if the claim is first raised after trial then the deficient specification will be viewed with greater tolerance and will be liberally constru[ed] in favor of validity." *Id.* at 405 (alteration in original) (internal quotation marks omitted). "[T]he claim will fail 'absent a clear showing of substantial prejudice to the accused – such as showing that the [specification] is so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had.'" *Id.* at 406 (quoting *United States v. Thompson*, 356 F.2d 216, 226 (2d Cir. 1965)).

---

[5] While TLP was not aware of it at the time, the gun was not loaded with ammunition.

### *b. Fair Notice*

The Due Process Clause of the Fifth Amendment[6] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). "It also requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

Likewise, the Sixth Amendment provides that an accused shall "be informed of the nature and cause of the accusation" against him. U.S. CONST. amend. VI.

> Thus, when an accused servicemember is charged with an offense at court-martial, each specification will be found constitutionally sufficient only if it alleges, either expressly or by necessary implication, every element of the offense, so as to give the accused notice [of the charge against which he must defend] and protect him against double jeopardy.

*Turner*, 79 M.J. at 403 (alteration in original) (internal quotation marks and citation omitted).

Thus, the constitutional concern implicated in both doctrines is one of fair notice. Our superior court has identified several potential sources of "fair notice," including "the *MCM*, federal law, state law, military case law, military custom and usage, and military regulations." *Vaughan*, 58 M.J. at 31 (citations omitted).

### *c. Article 115, UCMJ*

Appellant was convicted of communicating a threat in violation of Article 115, UCMJ, which required the Government to prove the following three elements beyond a reasonable doubt: (1) Appellant communicated certain language, expressing a present determination or intent to injure TLP presently or in the future; (2) that the communication was made known to TLP; and (3) that the communication was wrongful. *See Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), pt. IV, ¶ 53.b.(1). With respect to the third element, "the mental state requirement is satisfied if the accused transmitted the

---

[6] U.S. CONST. amend. V.

communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat." *Id*. at ¶ 53.c.(2).

### d. Mens Rea

A central tenet of criminality is that "a defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as mens rea, scienter, malice aforethought, guilty knowledge, and the like." *Elonis v. United States*, 575 U.S. 723, 734 (2015) (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)) (additional citation omitted). Silence in a statute does not prevent mens rea from being inferred. *United States v. Gifford*, 75 M.J. 140, 142 (C.A.A.F. 2016). "[T]he Supreme Court has repeatedly inferred a mens rea requirement in instances where it was necessary to separate wrongful conduct from otherwise innocent conduct . . . ." *Id*. at 143 (internal quotation marks and citation omitted).

The United States Supreme Court in *Counterman v. Colorado*, 143 S. Ct. 2106 (2023), recently clarified the mens rea requirement for communicating a "true threat" which falls outside First Amendment[7] protections.[8] The Supreme Court held the defendant must have "some understanding of his statements' threatening character," and that "a recklessness standard is enough" to lie outside the First Amendment's protection. *Id*. at 2113. In reaching its holding, the Supreme Court summarized the hierarchy of "the three basic choices" of mens rea under a subjective standard:

> Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove. A person acts *purposefully* when he "consciously desires" a result—so here, when he wants his words to be received as threats. Next down, though not often distinguished from purpose, is knowledge. A person acts *knowingly* when "he is aware that [a] result is practically certain to follow"—so here, when he knows to a practical certainty that others will take his words as threats. A greater gap separates those two from recklessness. A person acts *recklessly*, in the most common formulation, when he "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." That standard involves insufficient concern with risk, rather than awareness of impending harm. But still,

---

[7] U.S. CONST. amend. I.

[8] "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman*, 143 S. Ct. at 2114 (alteration in the original) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id*. at 2113.

> recklessness is morally culpable conduct, involving a "deliberate decision to endanger another."

*Counterman*, 143 S. Ct. at 2117 (alterations in original) (emphasis added) (citations omitted). The Supreme Court continued on to explain that "[i]n the threats context, [recklessly] means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id.* (footnote omitted) (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)).

The United States Court of Appeals for the Armed Forces (CAAF) has set forth the mens rea requirement embedded within the UCMJ offense of communicating a threat, most recently in *United States v. Harrington*, 83 M.J. 408 (C.A.A.F. 2023), albeit in an Article 134, UCMJ, context.[9] The court explained the subjective standard that applies to the third element:

> In contrast to the first element, the third element's requirement of wrongfulness is properly understood in relation to the *subjective* intent of the speaker. In determining if the speaker's subjective intent was wrongful under the third element, the key question is not whether the speaker intended to carry out the object of the threat, but rather "whether the speaker intended his or her words *to be understood as sincere.*"

*Harrington*, 83 M.J. at 414 (citations omitted). As the court previously explained in *United Sates v. Rapert*, 75 M.J. 164 (C.A.A.F. 2016), the subjective intent of "wrongful" relates to mens rea because "a contrary understanding

---

[9] The substantive elements of the Article 115, UCMJ, offense mirror those of the former Article 134, UCMJ, offense, with the exception that the Article 134, UCMJ, terminal element is no longer applicable. *See* 2019 *MCM*, App. 17, at A17-9. The 2019 *MCM* also notes that in "migrating" this offense from Article 134 to Article 115, UCMJ, it explicitly incorporated the prior caselaw interpretations to the "explanation" sections of the Article 115, UCMJ, offense. *Id.* ("The explanations for threat and wrongful are amended and are consistent with *Elonis v. United States*, [575 U.S. 723] (2015), and *United States v. Rapert*, 75 M.J. 164 (C.A.A.F. 2016)."). Specifically, the explanatory paragraph in the 2019 *MCM* was amended from the 2016 version to no longer include acting recklessly as a sufficient mens rea to demonstrate wrongfulness. *Compare Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 110.c. ("[T]o establish that the communication was wrongful it is necessary that the accused transmitted the communication for the purpose of issuing a threat, with the knowledge that the communication would be viewed as a threat, or acted recklessly with regard to whether the communication would be viewed as a threat."), *with* 2019 *MCM*, pt. IV, ¶ 53.c.(2) ("[T]he mental state requirement is satisfied if the accused transmitted the communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat.").

would render the third element superfluous." *Id.* at 169 (footnote and citation omitted).[10]

Although *Harrington* (issued in August 2023) omitted mention of the Supreme Court decision in *Counterman* (issued in June 2023), we note *Counterman* does not change the Article 115, UCMJ, evidentiary landscape because *Counterman* endorses the same subjective intent standard that "the defendant must have some understanding of his statements' threatening character." *Counterman,* 143 S. Ct. at 2113. While *Counterman* held a reckless mens rea "is enough" to establish the subjective standard, Article 115, UCMJ, requires a more culpable level—"wrongful"—which is defined in the 2019 *MCM* as a purposeful or knowing mens rea. *Compare Counterman*, 143 S. Ct. at 2133, *with* 2019 *MCM*, pt. IV, ¶ 53.c.(2).

### 2. Analysis

Appellant contends that, in light of *Counterman*, Article 115, UCMJ, is unconstitutionally vague on its face because neither the 2019 *MCM* nor military case law specify the mens rea necessary to establish wrongfulness. In the alternative, Appellant argues the charged Article 115, UCMJ, specification fails to state an offense because it does not allege the requisite mens rea. We find Appellant's arguments fail because both Article 115, UCMJ, and the charged specification provide fair notice that Appellant's acts were subject to criminal sanction.

On appeal, Appellant first argues "no source of military law, including the statute, the *MCM*, or case law, establishes the *level* of mens rea that the Government must prove wrongfulness under Article 115[, UCMJ]." We disagree. While silence in a statute does not prevent mens rea from being inferred, *Gifford*, 75 M.J. at 142, we are not faced with a silent statute. The third element of Article 115, UCMJ, explicitly provides that the communication be "wrongful," and "[t]he wrongfulness of [an] act obviously relates to mens rea." *United States v. King*, 34 M.J. 95, 97 (C.M.A. 1992). The President's explanation in the 2019 *MCM*, which serves as a source of "fair notice," *Vaughan*, 58 M.J. at 31, defines the "wrongful" mental state as one in which "the accused transmitted the communication for the *purpose* of issuing a threat or with *knowledge* that the communication will be viewed as a threat." 2019 *MCM*, pt.

---

[10] "The wrongfulness of [an] act obviously relates to mens rea (not elsewhere specified amongst the elements) and lack of a defense, such as excuse or justification." *United States v. King*, 34 M.J. 95, 97 (C.M.A. 1992); *accord United States v. Thomas*, 65 M.J. 132, 134 (C.A.A.F. 2007) ("The word 'wrongful,' like the words 'willful,' 'malicious,' 'fraudulent,' etc., when used in criminal statutes, implies a perverted evil mind in the doer of the act." (Citation omitted)).

IV, ¶ 53.c.(2) (emphasis added). Thus, Appellant was on fair notice that communicating a threat with either a purposeful mens rea (with the purpose of issuing a threat) or knowing mens rea (with knowledge that the communication will be viewed as a threat) is subject to criminal sanction.

Appellant suggests that the *MCM's* failure to further define the phrases "for the purpose of" and "with knowledge" creates confusion. This suggestion ignores well-established case law that sets forth and defines the hierarchy of mens rea. *See Counterman*, 143 S. Ct. at 2117 ("A person acts purposefully when he 'consciously desires' a result . . . . A person acts knowingly when 'he is aware that [a] result is practically certain to follow' . . . ." (Alteration in original) (citation omitted)); *see also* MODEL PENAL CODE §§ 2.02(2)(a) (a person acts purposefully when "it is his conscious object to engage in conduct of that nature or to cause such a result"), 2.02(2)(b) (a person acts knowingly when "he is aware that it is practically certain that his conduct will cause such a result").

Appellant further contends that *Counterman* stands for the proposition that only one of the three levels of subjective mens rea must be adopted by a criminal statute, and that the 2019 *MCM* "muddies the waters" by adopting two differing levels of mens rea. This interpretation misconstrues the Supreme Court's holding in *Counterman. Counterman* addresses, in the context of communicating a threat, the minimum level of mens rea that is required to establish criminality outside the First Amendment's protections. In answering this question, the Supreme Court held that "a recklessness standard is enough." *Counterman*, 143 S. Ct. at 2113. There is nothing in *Counterman* to suggest more demanding levels of mens rea would constitutionally fail. The 2019 *MCM* provides clear notice of a higher mens rea requirement for an Article 115, UCMJ, offense—a purposeful mens rea (with the purpose of issuing a threat) or knowing mens rea (with knowledge that the communication will be viewed as a threat). 2019 *MCM*, pt. IV, ¶ 53.c.(2).[11] We find no reasonable risk of confusion where the 2019 *MCM* provides fair notice that the two highest levels of culpability satisfy the mens rea requirement for an Article 115, UCMJ, offense.

In sum, Appellant's constitutional challenges fail. We find that Article 115, UCMJ, provides fair notice that Appellant's conduct was forbidden and subject to criminal sanction. *See Vaughan*, 58 M.J. at 31. Moreover, we find the

---

[11] In the hierarchy of culpable mental states, it is black letter law that proof of a higher mens rea satisfies proof of a less culpable mental state. *See, e.g.*, MODEL PENAL CODE § 2.02(5) ("When acting knowingly suffices to establish an element, such element also is established if a person acts purposely."); *see also Borden v. United States*, 141 S. Ct. 1817, 1823 (2021) (plurality opinion) (noting a limited and narrow distinction between a purposeful and knowing mental state).

charged specification is constitutionally sufficient as it expressly alleges every element of the offense. *See Turner*, 79 M.J. at 403.

## B. Legal and Factual Sufficiency

Appellant argues that his conviction for communicating a threat is legally and factually insufficient. We are not persuaded by Appellant's claims.

### 1. Additional Background

The Article 115, UCMJ, specification alleges: "In that [Appellant] . . . did, at or near Malmstrom Air Force Base, Montana, on or about 11 December 2020, wrongfully communicate to [TLP] a threat to shoot him with a firearm."

During direct examination by trial counsel, TLP testified about the series of events that unfolded once he walked out into the parking lot, believing he was going to help a stranded Airman with a broken-down vehicle:

Q. And then, what happens?

A. Can you give me a second?

Q. It's okay.

[[TLP] took a long pause and had tears on his face.]

A. [Appellant] asked me, did I know who [his fiancée] was, and [I] said, "No," because I didn't know who she was. And then, he took out his weapon and charged it.

Q. Okay. When you said, "Charged it," what do you mean by that?

A. [Indiscernible word] and cocked it back. So, he put one in the chamber.

Q. When you're saying, "It," what are you referring to?

A. The bullet.

Q. Okay. You said a gun?

A. Yes, ma'am.

Q. Okay. Where did he pull the gun out of?

A. I'm not too sure about that.

Q. Okay. Was this a stressful situation for you?

A. Not at the time, no.

. . . .

Q. So you see him pull out a gun, what is going through your head when he pulls it out?

A. At first I thought -- I asked him if he was going to shoot me, first off, to confirm he was going to kill me. And he said, "Yes," so I was like -- I guess it was -- I originally thought that this was like a terrible place [to] die, but I was like, "Okay."

Q. Okay. So he says yes, he's going to shoot you, what happens next?

A. Then I told him to go ahead and shoot me. And then he got frustrated and he told me to get on my knees and beg for mercy. And I said, "No." And he got mad and he hit me with the gun.

On cross-examination, trial defense counsel asked TLP further questions about the series of events:

Q. At that point [Appellant] asked you if you knew who [his fiancée] was?

A. Yes.

Q. And at first you didn't remember who she was?

A. No, sir.

Q. So you told him you didn't know [Appellant's fiancée]?

A. Yes.

Q. And then you saw him pull a gun out?

A. Yes.

Q. And when you saw that, you laughed at [Appellant], right?

A. Yes.

Q. You weren't afraid of him, were you?

A. No.

Q. In fact, you told him to shoot you?

A. Yes, sir.

Q. And after you told him to shoot you is when he hit you?

A. Yes, sir.

On redirect examination, TLP provided further explanation of his reaction in the moment when Appellant pulled out and charged the gun:

Q. Okay. Now, I want to talk to you again about what you were feeling when [Appellant] was going through the gun, what emotions were you feeling?

A. I didn't feel anything. I just le[ft] it up to faith actually.

Q. Okay. Now, why did you tell [Appellant] to shoot you?

[Lengthy period of silence.]

A. I just felt like, if that's what he wanted to do, then so be it.

While TLP testified that he asked Appellant whether he was going to shoot him, the other two percipient witnesses to the events—Appellant's two friends who accompanied him, Airman First Class (A1C) RLL and A1C DRW—testified at trial that they did not recall Appellant threatening to shoot TLP. A1C RLL testified that he "really can't remember" Appellant threatening to shoot TLP. A1C DRW testified "[t]his is kind of where it gets foggy" when asked what Appellant said to TLP. A1C DRW explained, "There's some kind of dialogue, I can't remember what it was, cause like I said, I was in like a shocked state." Later, on cross-examination, A1C DRW clarified that he could not remember what TLP said, if anything.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to testify credibly. *See United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (explaining the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

The offense of communicating a threat encompasses both an objective and a subjective standard. *Harrington*, 83 M.J. at 414. An assessment of whether the language was sufficiently "threatening"—the first element—is judged from the *objective perspective* from the viewpoint of a "reasonable person *in the recipient's place*." *Id*. (citation omitted). An assessment of whether the speaker intended the target of his communication to perceive it as a threat, or that he knew the intended target would interpret it as a threat—the third element—is viewed from the *subjective perspective* of the speaker. *Id*. (citation omitted). In conducting the objective/subjective analysis, context matters and words should not be considered in a vacuum. *United States v. Brown*, 65 M.J. 227, 231 (C.A.A.F. 2007) ("Context gives meaning to literal statements.").

> Divorcing [the words] from their surroundings and their impact on the intended subject is illogical and unnatural. Legal analysis of a threat must take into account both the words used and the surrounding circumstances. Without such a subtle examination absurd results might arise, defeating both the text and purpose of paragraph [53.b.] of the [2019 *MCM*].

*Id*. at 232.

With respect to the objective assessment of whether the language was sufficiently threatening, "[a]lthough the recipient's reaction to the alleged threat provides useful context, it does not control any element of communicating a threat . . . ." *Harrington*, 83 M.J. at 415. Even if the trier of fact found the

recipient "did not actually feel threatened . . . the [factfinder] could neverthe-less have concluded that [the recipient's] reaction simply differed from that of a reasonable person." *Id.* (footnote omitted); *see also United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995) ("Our only concern is whether a reasonable factfinder could conclude beyond a reasonable doubt that a reasonable person in the recipient's place would perceive the contested statement by appellant to be a threat." (Citations omitted)).

With respect to the subjective assessment of the speaker's intent, "the sur-rounding circumstances may so belie or contradict the language of the decla-ration as to reveal it to be a mere jest or idle banter." *United States v. Gilluly*, 32 C.M.R. 458, 461 (C.M.A. 1963) (citations omitted). "A statement made under such circumstances . . . is not wrongful." 2019 *MCM*, pt. IV, ¶ 53.c.(2).

### 3. Analysis

Appellant contends his conviction for wrongful communication of a threat is neither legally nor factually sufficient because the evidence does not estab-lish the first and third elements. Specifically, Appellant argues (1) the Govern-ment did not present sufficient evidence that Appellant made any communica-tion as alleged in the specification; (2) any communication Appellant made does not objectively qualify as a threat; and (3) the Government failed to establish Appellant's subjective intent to threaten TLP. For the reasons set forth below, each of these arguments fail, and none of them undermine our confidence that the evidence presented at trial established Appellant's guilt beyond a reason-able doubt. Instead, we are convinced beyond a reasonable doubt that Appel-lant directed a threatening communication towards TLP, which an objective observer in TLP's place would have perceived as a threat to shoot him. We also conclude that, under the totality of the circumstances, Appellant intended his communication to be perceived by TLP as a threat, or at a minimum, knew that TLP would perceive his threat as sincere. *See Harrington*, 83 M.J. at 414.

#### a. Element 1 – Threatening Language

##### i) Communication

We are unconvinced by Appellant's argument that the Government failed to present sufficient evidence that he made any communication as alleged in the specification. The specification alleges that Appellant communicated a threat to shoot TLP with a firearm. At trial on direct examination, TLP testi-fied that Appellant pulled out a gun and charged the weapon, as if to load a bullet into the chamber. Upon seeing the gun, TLP "asked [Appellant] if he was going to shoot [TLP], first off, to confirm [Appellant] was going to kill [him]. And [Appellant] said, 'Yes.'" In this context, where Appellant drew a gun and appeared to load a bullet into the chamber, we have no hesitation in concluding a rational trier of fact could find beyond a reasonable doubt that Appellant's

affirmative response of "yes," to the question of whether he was going to shoot TLP, constituted a communication of an intent to shoot TLP. *Brown*, 65 M.J. at 231 ("Context gives meaning to literal statements.").

Neither TLP's testimony on cross-examination, nor A1C RLL's and A1C DRW's testimony that they did not recall a threat, disturbs our finding. Appellant argues that TLP testified to a different version of events on cross-examination in which Appellant "appeared to say nothing." This argument misconstrues the testimony. On cross-examination, TLP was asked a series of leading questions, to which he gave yes or no answers. Significantly, TLP was not asked on cross-examination about his question to Appellant nor about Appellant's response. The fact that TLP did not testify on cross-examination about Appellant's communication of a threat was simply because he was not asked about it, not because he was providing a different version of events. TLP's testimony on cross-examination in no way conflicted with his testimony on direct examination about the question he asked—"I asked him if he was going to shoot me"—and Appellant's response—"he said, 'Yes.'"

Moreover, the fact that Appellant's two friends, A1C RLL and A1C DRW, could not recall what was said between Appellant and TLP once Appellant drew the gun does not directly contradict TLP's testimony. While A1C DRW could not remember what was said because he was in a "shocked state," he nonetheless corroborated that there was "some kind of dialogue." While their testimony that they did not recall a threat could arguably be construed as evidence that there was no threat communicated, in testing for legal sufficiency we must draw every reasonable inference from the evidence in favor of the Government. *See Barner*, 56 M.J. at 134. Moreover, in testing for factual sufficiency, we find TLP's testimony sufficiently credible that we are ourselves convinced beyond a reasonable doubt that the threat was communicated. *See Rodriguez-Rivera*, 63 M.J. at 383.

### ii) Objective standard of "threatening" language

Whether language qualifies as "threatening" for purposes of Article 115, UCMJ, is measured from a "reasonable person *in the recipient's place*"—that is, from an objective perspective evaluating both the language of the communication itself as well as its surrounding context. *Harrington*, 83 M.J. at 414. In the context of Appellant pulling out a gun and appearing to load a bullet into the chamber, we conclude an objective person in TLP's position would have interpreted Appellant's affirmative response—his answer "yes" to the question of whether he was going to shoot TLP—as objectively threatening.

Appellant seeks to avoid this conclusion by suggesting that "a mere affirmation to a question" may not qualify as threatening under the definition in the 2019 *MCM*. While the literal word "yes" in a vacuum has no threatening

14

connotation, we are not conducting our analysis in a vacuum. *See Brown*, 65 M.J. at 231–32 ("The words communicated certainly matter because they are the starting point in analyzing a possible threat. But words are used in context."). In this context, where Appellant angrily confronted TLP with an apparently charged gun, Appellant's one-word answer of "yes" is fairly understood as "yes, I am going to shoot you." A reasonable person in TLP's shoes would have viewed Appellant's response as objectively threatening in this context.

Though not specifically argued by Appellant, we note that TLP's *subjective* response does not alter our findings. TLP testified that he was not afraid and that he responded to the threat by laughing and telling Appellant to "go ahead and shoot" him. He later clarified that he "didn't feel anything" and "le[ft] it up to faith." While TLP may not have responded in a way that aligns with preconceived notions of how someone would respond to a threatening situation, our concern is not with TLP's response—instead our concern is whether a reasonable person in TLP's place would have perceived the communication as threatening. *Harrington*, 83 M.J. at 415 ("Although the recipient's reaction to the alleged threat provides useful context, it does not control any element of communicating a threat . . . ."). We are satisfied that, even if TLP himself did not actually feel threatened, a reasonable person would have. *Id.* (concluding that even if the recipient "did not actually feel threatened . . . the [factfinder] could nevertheless have concluded that [the recipient's] reaction simply differed from that of a reasonable person").

### b. Element 3 – Wrongful

Whether the communication was wrongful for purposes of Article 115, UCMJ, requires a *subjective* assessment of whether the speaker intended the target of his communication to perceive it as a threat, or whether he knew he would interpret it as a threat. *Id.* at 414. On this point, Appellant argues the evidence is insufficient to demonstrate wrongfulness because "the evidence appeared to show that [Appellant] was on 'autopilot' when he answered to an escalating situation rather than actually intending to threaten [TLP] by his words." We reject the implication that Appellant's own actions in escalating a confrontation he initiated while brandishing a firearm absolve him of criminality.

The wrongfulness of a threat is not reliant upon an accused's intent to implement it, but on his intent that the threat be *"understood as sincere." Id.* (quoting *Rapert*, 75 M.J. at 169 n.10). Indeed, the fact that a threat was uttered while Appellant was in an agitated state demonstrates that it was more, not less, likely to be understood as sincere. As our superior court explained in *United States v. Davis*, "[t]hreats are most likely to be made while the speaker is in an emotional state, and those are the threats most likely to speak

the truth about the speaker's seriousness . . . ." 19 C.M.R. 160, 163 (C.M.A. 1955).

While we acknowledge it is also possible that in an agitated state the speaker could say something outrageous without intent to execute the threatened act, that fact alone does not undercut "wrongfulness" because it does not undercut the likelihood that the speaker wants their message to be *perceived* as sincere. Here, the evidence demonstrates that, in the heat of passion of believing TLP had sexually assaulted his fiancée, Appellant brandished a firearm and appeared to load a bullet into the chamber while responding "yes" he was going to shoot TLP. In evaluating the surrounding context, we see no evidence that would indicate anything other than the Appellant's purpose or knowledge that his threat would be perceived as sincere.

In sum, as to legal sufficiency, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. As to factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## C. Speedy Trial

Appellant contends all charges should be dismissed with prejudice because the Government violated his right to speedy trial under both R.C.M. 707 and the Sixth Amendment. We find no speedy trial violation.

### 1. Additional Background

#### *a. Exclusions granted by the preliminary hearing officer (PHO) and chief circuit military judge (CCMJ) prior to the first arraignment*

The charges were preferred on 27 May 2021 and a PHO was appointed on that same date. The Defense requested a delay of the Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing from 9 June 2021 to 25 June 2021, which time the PHO accordingly excluded from speedy trial computation, for a total of 16 days (9 June 2021 to 24 June 2021—the day before the preliminary hearing). On 16 June 2021, Appellant made a speedy trial request. After the preliminary hearing, the charges were referred on 30 August 2021. At that time, trial counsel stated they would be ready to proceed to trial on 20 September 2021 and the Defense stated they would not be ready to proceed to trial until

27 February 2022. The CCMJ set an arraignment date of 28 October 2021[12] and excluded the time between 20 September 2021 (the prosecution trial ready date) and 27 October 2021 (the day before arraignment) from speedy trial computation, a total of 38 days. The parties do not dispute that as of the 28 October 2021 arraignment, 154 days had elapsed since preferral of charges, and 54 days (the 16-day PHO exclusion plus the 38-day CCMJ exclusion) had been excluded from speedy trial computation, meaning for the purposes of speedy trial computation 100 days elapsed from preferral to arraignment.

### b. Exclusion granted by the general court-martial convening authority (GCMCA) after withdrawing charges

At the first arraignment on 28 October 2021, the military judge called upon Appellant to enter his pleas. Appellant, through his trial defense counsel, deferred entry of his pleas and moved for a new preliminary hearing on the basis that the PHO had an appearance of bias.[13] Ultimately, on 6 November 2021, the military judge issued a ruling granting the defense motion, finding the preliminary hearing had not been in substantial compliance with Article 32, UCMJ, and R.C.M. 405. Accordingly, on 29 November 2021, the GCMCA withdrew the charges, appointed a new PHO, and ordered a new preliminary hearing. Significantly, the charges were only withdrawn, but never dismissed, and no new charges were preferred.

The second preliminary hearing was held on 21 December 2021, which the new PHO documented as the first date of mutual availability. On 6 January 2022, trial counsel submitted a request to the GCMCA asking for an exclusion of time from 20 September 2021 to 27 February 2022—the time between trial counsel's original trial ready date and defense counsel's original trial ready date (before the charges were withdrawn for a new preliminary hearing). Trial counsel argued in his request that this period should be excluded "[t]o account for the time during which the defense counsel was not available for trial and the time needed for a new Article 32[, UCMJ,] hearing." On 7 January 2022, the GCMCA granted the request, excluding 20 September 2021 through 27 February 2022 from speedy trial computation, a total of 160 days.[14] On appeal, the validity of this GCMCA exclusion of time is in dispute.

---

[12] Counsel agreed to the arraignment date in the case-docketing memorandum.

[13] The Defense did not claim the PHO had actual bias.

[14] The period excluded by the GCMCA (20 September 2021 through 27 February 2022) overlapped the period previously excluded by the CCMJ when scheduling the initial

### c. Exclusion granted by the chief trial judge (CTJ) after charges were re-referred

On 17 February 2022, the GCMCA re-referred the same charges and specifications to a general court-martial. At that time, trial counsel stated the Prosecution would be ready to proceed to trial on 6 March 2022, but defense counsel stated they would not be ready until 18 April 2022. The CTJ set the trial date for 18 April 2022 and excluded the time from 6 March 2022 (the Prosecution's trial ready date) to 17 April 2022 (the day before the trial date), a total of 43 days. Appellant was arraigned on the re-referred charges and specifications on 18 April 2022. On appeal, the validity of this CTJ exclusion of time is not in dispute.

### d. Speedy Trial Motion

Prior to the second arraignment, defense counsel moved to dismiss the charges and specifications claiming Appellant's right to speedy trial was violated under both R.C.M. 707 and the Sixth Amendment. In the motion, the Defense conceded that there were three proper exclusions of time from the speedy trial clock: (1) the original PHO exclusion of time before the first preliminary hearing (from 9 June 2021 to 24 June 2021); (2) the CCMJ exclusion of time before the first arraignment (from 20 September 2021 to 27 October 2021); and (3) the CTJ exclusion of time before the second arraignment (from 6 March 2022 to 17 April 2022). However, the Defense argued the GCMCA exclusion of time (from 20 September 2021 through 27 February 2022) was an abuse of discretion.

In denying the defense motion, the military judge ruled that the first arraignment on 28 October 2021 stopped the speedy trial clock, and thus Appellant was brought to trial within 120 days as required by R.C.M. 707.[15] In the alternative, if the speedy trial clock did not stop at the first arraignment, the military judge found the speedy trial clock was tolled between the first arraignment and the withdrawal of charges, and that a portion of the GCMCA exclusion of time was valid—the time needed to accomplish a new preliminary hearing and re-refer the charges. With respect to the Sixth Amendment claim, the military judge denied relief because the delay itself was not facially unreasonable and Appellant did not suffer prejudice.

---

arraignment (20 September 2021 through 27 October 2021). Trial counsel explained in the request to the GCMCA that "it is questionable whether the [m]ilitary [j]udge's prior exclusion of time applies," because the charges had since been withdrawn.

[15] The military judge found that, taking into account the PHO and CCMJ exclusions, the speedy trial clock was at day 102 at the first arraignment. We find the speedy trial clock was at day 100 at the first arraignment.

### e. Leave

Leave records show Appellant took 35 days of leave between 29 November 2021 and 21 January 2022.

### 2. Law

#### a. Standard of Review

"In the military justice system, an accused's right to a speedy trial flows from various sources, including the Sixth Amendment . . . and R.C.M. 707 of the Manual for Courts-Martial." *United States v. Cooper*, 58 M.J. 54, 57 (C.A.A.F. 2003). We conduct a de novo review of speedy trial claims. *United States v. Guyton*, 82 M.J. 146, 151 (C.A.A.F. 2022) (first citing *United States v. Wilder*, 75 M.J. 135, 138 (C.A.A.F. 2016); and then citing *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2014)). However, we review decisions granting delay under R.C.M. 707, thereby rendering that time excludable for speedy trial purposes, for an abuse of discretion. *Id.* (citing *United States v. Lazauskas*, 62 M.J. 39, 41–42 (C.A.A.F. 2005)).

#### b. Rule for Courts-Martial 707

The Rule requires that an accused must be brought to trial within 120 days of preferral of charges. R.C.M. 707(a)(1). For purposes of R.C.M. 707, an "accused is brought to trial . . . at the time of arraignment." R.C.M. 707(b)(1).[16] "Ordinarily, when an accused is not under pretrial restraint and charges are *dismissed*, a new 120-day time period begins on the date of re[-]preferral." *Guyton*, 82 M.J. at 151 (emphasis added) (first citing R.C.M. 707(b)(3)(A)(i) (2016 ed.); and then citing *United States v. Hendrix*, 77 M.J. 454, 456 (C.A.A.F. 2018)).[17] However, "[i]f charges are *merely withdrawn* and not subsequently dismissed, . . . the R.C.M. 707 'speedy-trial clock continues to run.'" *Id.*

---

[16] "Arraignment takes place when a military judge reads the charges to an accused and calls upon the accused to plead." *United States v. Cooper*, 58 M.J. 54, 59 n.5 (C.A.A.F. 2003).

[17] R.C.M. 707 was amended in the 2019 *MCM*, but there was no substantive change to the relevant provision. *See* R.C.M. 707(b)(3)(A)(ii)(I) ("In the event of dismissal of charges . . . a new 120-day period begins as follows: . . . [f]or an accused not under pretrial restraint at the time of dismissal . . . a new 120-day period begins on . . . the date on which charges are preferred anew.")

19

(emphasis added) (quoting *United States v. Leahr*, 73 M.J. 364, 367 (C.A.A.F. 2014)).[18]

"Applying the speedy trial provisions of R.C.M. 707(c) does not merely consist of calculating the passage of calendar days" because the Rule provides that certain days shall be excluded from the 120-day clock. *Id.* Specifically, the convening authority prior to referral, or the military judge after referral, may grant requests for pretrial delay, and such approved delays "shall be excluded when determining whether the [120-day clock] has run." R.C.M. 707(c). Notably, "[t]he R.C.M. 'does not preclude after-the-fact approval of a delay'" by the military judge or convening authority. *Guyton*, 82 M.J. at 151 (quoting *United States v. Thompson*, 46 M.J. 472, 475 (C.A.A.F. 1997)).

"The decision to grant or deny a reasonable delay is a matter within the sole discretion of the convening authority or a military judge . . . based on the facts and circumstances then and there existing." R.C.M. 707(c)(1), Discussion. "However, this Court requires 'good cause' for the delay and also requires that the length of time requested be 'reasonable' based on the facts and circumstances of each case." *Guyton*, 82 M.J. at 151 (Citations omitted). Pursuant to R.C.M. 707(c), the military judge or convening authority "is empowered to grant delays, not blanket exclusions of time." *United States v. Proctor*, 58 M.J. 792, 795 (A.F. Ct. Crim. App. 2003). "[A] 'delay' under R.C.M. 707 [is] 'any interval of time between events.'" *Id.* (quoting *United States v. Nichols*, 42 M.J. 715, 721 (A.F. Ct. Crim. App. 1995)).

### c. Sixth Amendment

The Sixth Amendment demands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. CONST. amend VI. "In military prosecutions, the accused's Sixth Amendment speedy trial protections are generally triggered when charges are preferred." *United States v. Harrington*, 81 M.J. 184, 189 (C.A.A.F. 2021) (footnote omitted) (citing *Danylo*, 73 M.J. at 186). "Analysis of a Sixth Amendment speedy trial claim requires consideration of the entire period of delay from . . . preferral of charges until commencement of trial on the merits." *Danylo*, 73 M.J. at 189 (citing *United States v. MacDonald*, 456 U.S. 1, 6–8 (1982)).

---

[18] The convening authority "may for any reason cause any charges or specifications to be withdrawn from a court-martial at any time before findings are announced." R.C.M. 604(a). "Charges that are withdrawn should be dismissed . . . unless it is intended to refer them anew promptly." R.C.M. 604(a), Discussion. "Charges that have been withdrawn . . . may be referred to another court-martial unless the withdrawal was for an improper reason." R.C.M. 604(b).

"We determine whether an appellant has been denied his right to a speedy trial using the four-factor test that the Supreme Court established in *Barker v. Wingo*, 407 U.S. 514 (1972)." *Harrington*, 81 M.J. at 189 (citing *Wilder*, 75 at 138). The four factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Id.* (quoting *Danylo*, 73 M.J. at 186). Prejudice under *Barker* is "assessed in the light of the three interests of the accused which the speedy trial right was designed to protect[:] . . . (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Guyton*, 82 M.J. at 155 (alteration in original) (internal quotation marks and citation omitted). "Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (internal quotation marks and citation omitted). "A showing of prejudice is required to establish a violation of the Sixth Amendment Speedy Trial Clause." *Reed v. Farley*, 512 U.S. 339, 353 (1994); *accord Danylo,* 73 M.J. at 189 (holding that the appellant "has not demonstrated prejudice that rises to the level of a Sixth Amendment violation" and thus that his "Sixth Amendment speedy trial rights were not violated" (citations omitted)).

### 3. Analysis

#### a. R.C.M. 707

Appellant makes no argument with respect to three exclusions of time: (1) the original PHO exclusion of time before the first preliminary hearing (from 9 June 2021 to 24 June 2021); (2) the CCTJ exclusion of time before the first arraignment (from 20 September 2021 to 27 October 2021); and (3) the CTJ exclusion of time before the second arraignment (from 6 March 2022 to 17 April 2022). We also find each of those exclusions of time to be valid.

Appellant does, however, contend that the military judge made fundamental errors in two aspects of her R.C.M. 707 ruling: first, finding that the first arraignment on 28 October 2021 stopped the speedy trial clock; and second, alternatively finding that it was proper for the GCMCA to exclude the time needed to accomplish a new preliminary hearing and re-refer the charges. For the reasons set forth below, we agree with Appellant's first contention and find the first arraignment did not stop the speedy trial clock because charges were merely withdrawn but not dismissed. However, while we find the entirety of the GCMCA exclusion was not reasonable "based on the facts and circumstances then and there existing," we do find the portion of time from the day after the first arraignment to the day before the re-referral of charges, from 29 October 2021 to 16 February 2022, meets both good-cause and reasonable-in-length standards. Taking into account the valid exclusions of time, the speedy

trial clock was at day 118 when Appellant was brought to trial at the second arraignment on 18 April 2022, in compliance with R.C.M. 707's 120-day mandate. For illustration purposes, our findings, as explained below, create the following speedy trial chronology:

| Date | Days Elapsed | Event | R.C.M. 707 Speedy Trial Clock |
|------|--------------|-------|-------------------------------|
| 27 May 21 | 0 | Preferral | 0 |
| 9 Jun. 21 | 13 | First day of PHO exclusion | 12 |
| 16 Jun. 21 | 20 | Speedy trial demand | 12 |
| 24 Jun. 21 | 28 | Last day of PHO exclusion | 12 |
| 25 Jun. 21 | 29 | First preliminary hearing | 13 |
| 30 Aug. 21 | 95 | First referral | 79 |
| 20 Sep. 21 | 116 | First day of CCMJ exclusion | 99 |
| 27 Oct. 21 | 153 | Last day of CCMJ exclusion | 99 |
| 28 Oct. 21 | 154 | First arraignment | 100 |
| 29 Oct. 21 | 155 | First day of valid portion of GCMCA exclusion | 100 |
| 6 Nov. 21 | 163 | Military judge grants defense motion and orders a new preliminary hearing | 100 |
| 29 Nov. 21 | 186 | Charges withdrawn | 100 |
| 21 Dec. 21 | 208 | Second preliminary hearing | 100 |
| 16 Feb. 22 | 265 | Last day of valid portion of GCMCA exclusion | 100 |
| 17 Feb. 22 | 266 | Re-referral of charges | 101 |
| 6 Mar. 22 | 283 | First day of CTJ exclusion | 117 |
| 17 Apr. 22 | 325 | Last day of CTJ exclusion | 117 |
| 18 Apr. 22 | 326 | Second arraignment | 118 |

### *i) The speedy trial clock was not stopped by the first arraignment*

The military judge found, and the Government argues on appeal, that the first arraignment on 28 October 2021 stopped the speedy trial clock for purposes of R.C.M. 707. In reaching this finding, the military judge relied on *United States v. Cooper*, 58 M.J. 54 (C.A.A.F. 2003). We find reliance on *Cooper* inapposite in the instant case. Our superior court in *Cooper* held that arraignment does not stop the Article 10, UCMJ, speedy trial clock.[19] *Id.* at 59 (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)). In setting forth the procedural background, the court summarily "agree[ed]" with the military judge's ruling that the arraignment satisfied the R.C.M. 707 speedy trial clock, "which is why th[at] appeal concern[ed] only whether Article 10[, UCMJ] was violated." *Id.* at 55 (footnote omitted). Thus, although the facts of *Cooper* involved re-opening the preliminary hearing and subsequent re-referral of identical charges, the court's holding does not address R.C.M. 707, much less the issue of whether the speedy trial clock stops at arraignment in the event that charges are later withdrawn but not dismissed.

Our superior court has, however, directly addressed this issue in *United States v. Leahr*, 73 M.J. 364 (C.A.A.F. 2014). In deciding whether the appellant's right to a speedy trial under R.C.M. 707 was violated, the court in *Leahr* considered whether the convening authority's actions taken after the first arraignment amounted to a mere withdrawal of the original charges or included the extra action of dismissal. *Id.* The court ultimately found the convening authority dismissed the original charges, and that dismissal reset the speedy trial clock pursuant to R.C.M. 707(b)(3)(A). *Id.* at 367. The court further held, "[i]f, however, [the convening authority's] action amounted to a withdrawal only, the speedy trial clock was not reset" because "[i]f charges are merely withdrawn and not subsequently dismissed, . . . the R.C.M. 707 'speedy-trial clock continues to run.'" *Id.* (quoting *United States v. Britton*, 26 M.J. 24, 26 (C.M.A. 1988)). More recently, in *Guyton*, where charges were withdrawn after the first arraignment and identical charges were subsequently re-referred, our superior court reiterated that the R.C.M. 707 speedy trial clock continues to run if the charges are not subsequently dismissed. 82 M.J. at 151 ("If charges are merely withdrawn and not subsequently dismissed . . . the R.C.M. 707 'speedy-trial clock continues to run.'" (Quoting *Leahr*, 73 M.J. at 367)).

---

[19] Article 10, UCMJ, is another source of speedy trial rights which applies when an accused is placed in pretrial restraint, requiring "immediate steps" be taken to try the accused or to dismiss the charges and release the accused. 10 U.S.C. § 810. Appellant was not placed in pretrial restraint and Article 10, UCMJ, does not apply in this case.

Here, there is no dispute that, after the first arraignment, the convening authority merely withdrew the charges without dismissal. Accordingly, the R.C.M. 707 speedy trial clock continued to run.

### ii) GCMCA's exclusion of time

We now turn to whether the GCMCA's exclusion of time was an abuse of discretion. As an initial matter, we note the GCMCA had proper authority to grant the delay of the proceedings and exclude time related to the delay, as all charges had been withdrawn and had not yet been re-referred. R.C.M. 707(c)(1) ("Prior to referral, all requests for pretrial delay . . . will be submitted to the convening authority . . . ."); *see also United States v. Williams*, 55 M.J. 302, 304 (C.A.A.F. 2001) ("When charges are referred to a court-martial, the court retains jurisdiction of the case from the point of referral . . . except when the convening authority withdraws the charges . . . ." (Citation omitted)). We also note that an "after-the-fact approval of a delay" does not preclude the broad latitude the convening authority has in deciding whether case-processing delays prior to referral are excludable. *See Guyton*, 82 M.J. at 151 (citation omitted). However, we must still test whether the exclusion met "good-cause and reasonable-in-length standards," *Thompson* 46 M.J. at 475, in light of the "facts and circumstances then and there existing," R.C.M. 707(c)(1), Discussion.

We do not find good cause for the entirety of the GCMCA's exclusion, as it was not reasonable in light of the facts and circumstances existing at the time. The delay was based upon the interval of time between two dates: the trial counsel's original trial ready date (20 September 2021) and defense counsel's original trial ready date (27 February 2022) after the first referral of charges. However, at the time the GCMCA granted the exclusion on 7 January 2022, the original trial ready dates were no longer "good cause" for a delay because the charges had already been withdrawn and had not yet been re-referred. Based on the circumstances at the time, counsel's original trial ready dates were no longer "events" that could establish reasonable grounds for a delay. *See Proctor*, 58 M.J. at 795 ("A 'delay' under R.C.M. 707 [is] 'any interval of time between events.'" *Id*. (quoting *Nichols*, 42 M.J. at 721)). Moreover, the CCMJ's prior exclusion of time (from 20 September 2021 to 27 October 2021) already accounted for the delay between the trial counsel's original trial ready date and the first arraignment.

However, trial counsel's request to the GCMCA also stated the delay was needed to account for the time to conduct a new preliminary hearing—relief which Appellant himself requested. We find the delay between the original arraignment—when Appellant moved for a new preliminary hearing—and the re-referral of charges meets both good-cause and reasonable-in-length

standards. It was reasonable to exclude this time period, as it takes into account the time that elapsed for the military judge to provide her ruling on Appellant's motion for a new preliminary hearing, to provide Appellant with the relief he requested (withdrawal of the charges and a new preliminary hearing), and the time needed for the GCMCA to make a decision anew on re-referral of the charges. While 103 days passed between the military judge's order for a new preliminary hearing and the re-referral of charges, nothing in the record indicates the delay request was a "rationalization for neglect or willful delay." *Thompson*, 46 M.J. at 475. In this light, we find the only time properly excluded by the GCMCA was from 29 October 2021 (the day after the initial arraignment) to 16 February 2022 (the day before the re-referral of charges). As set forth in our chronology chart, *supra*, when taking into account the valid exclusions of time, Appellant was brought to trial on day 118 and his R.C.M. 707 speedy trial rights were not violated.

### b. Sixth Amendment

Under the first *Barker* factor—length of the delay—we assume without deciding the delay of 326 days to bring Appellant to trial is facially unreasonable, and turn to the remaining *Barker* factors.

We find the second *Barker* factor—reasons for the delay—on balance weighs slightly in Appellant's favor. As set forth *supra*, significant delays resulted from defense counsel availability. However, the majority of the delay resulted from the military judge's ruling that the original Article 32, UCMJ, PHO had an appearance of bias, and the steps the Government needed to take to afford Appellant the relief he requested. We note the case processing time after the military judge's order to conduct a new preliminary hearing until the re-referral of charges, a total of 103 days, was not stellar. However, we are mindful that "constant motion is not the standard so long as the processing reflects reasonable diligence under all the circumstances," and we see no indication that the delays were a deliberate attempt to hamper the Defense. *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005).

The third *Barker* factor weighs slightly in favor of Appellant. While Appellant made a speedy trial demand on 16 June 2021, prior to the first Article 32, UCMJ, preliminary hearing, he did not renew a speedy trial demand after the charges were withdrawn. Moreover, after making the speedy trial demand, the Defense requested significant delays for the preliminary hearing and the trial date, which tend to belie the genuineness of a speedy trial demand.

Turning to the final *Barker* factor, we find Appellant has failed to demonstrate any of the three forms of cognizable prejudice. Appellant was not in pretrial confinement. Thus, Appellant's argument focuses on the interests he had

in minimizing his anxiety and concern, and limiting the possibility his defense would be impaired.

Appellant contends he suffered anxiety because, pending his court-martial, he remained on administrative hold at Malmstrom Air Force Base where he was separated from his young son who was living in Texas. Appellant argues he could only "sporadically" visit his son when he "had available leave." However, leave records show Appellant was granted 35 days of leave between 29 November 2021 and 21 January 2022, belying his contention of only "sporadic" ability to visit his son. We find Appellant has not demonstrated "'some degree of particularized anxiety and concern greater than the normal anxiety and concern associated with' the delay of his trial." *Guyton*, 82 M.J. at 155 (quoting *United States v. Reyes*, 80 M.J. 228, 229 (C.A.A.F. 2020)).

Appellant also contends the delay impaired his defense because government witnesses could not accurately remember important details from the assault and communication of a threat. But the record does not indicate the passage of time impacted the witnesses' ability to recall, but rather suggests the shock and stress of the events, which included Appellant brandishing a firearm that appeared to be charged with a bullet in the chamber, impaired the witnesses' ability to perceive in the moment.[20] Moreover, to the extent the government witnesses were unable to recall the details of the threat or the assault, their lack of recollection did not prejudice the Appellant but instead had the potential to work to his advantage.

> A . . . difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage . . . . As the time between the commission of the crime and trial lengthens, witnesses['] . . . memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so.

*Barker*, 407 U.S. at 532.

For the reasons cited above, Appellant has not demonstrated *Barker* prejudice. Further, because the other *Barker* factors weigh only slightly in his favor, the lack of prejudice demonstrates his Sixth Amendment speedy trial rights were not violated. *See Reed,* 512 U.S. at 353 (a showing of prejudice is required to establish a Sixth Amendment speedy trial violation under *Barker*); *see also Guyton,* 82 M.J. at 155 (holding where no prejudice was demonstrated,

---

[20] A1C DRW testified "this is kind of where it gets foggy" when asked what Appellant said to TLP. AIC DRW explained, "There's some kind of dialogue, I can't remember what it was, cause like I said, I was in like a shocked state."

and the other *Barker* factors only slightly weighed in the appellant's favor, there was no Sixth Amendment speedy trial violation).

## D. Timeliness of Appellate Review

Additionally, we consider whether Appellant is entitled to relief for a facially unreasonable appellate delay. *Moreno*, 63 M.J. at 135 (citations omitted); *Tardif*, 57 M.J. at 223–24. We decline to grant such relief.

### 1. Law

We review de novo whether an appellant has been denied the due process right to speedy appellate review. *Moreno*, 63 M.J. at 135 (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of a case being docketed. *Id.* at 142. A presumptively unreasonable delay triggers an analysis of the four *Barker* factors. *Barker*, 407 U.S. at 530; *Moreno*, 63 M.J. at 135 (citations omitted). A presumptively unreasonable delay satisfies the first factor, but the Government "can rebut the presumption by showing the delay was not unreasonable." *Moreno*, 63 M.J at 142. Assessing the fourth factor of prejudice, we consider the interests of "prevention of oppressive incarceration pending appeal;" "minimization of anxiety and concern of those convicted awaiting the outcome of their appeals;" and "limitation of the possibility that . . . grounds for appeal, and . . . defenses in case of reversal and retrial, might be impaired." *Id.* at 138–39 (citations omitted). In the absence of prejudice as identified in *Moreno*, a due process violation exists only when "the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system.*" United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Furthermore, we are required by Article 66(d), UCMJ, to determine which findings of guilty and the sentence or part thereof "should be approved." 10 U.S.C. § 866(d); *see also Tardif*, 57 M.J. at 224. In *Tardif*, the CAAF recognized "a Court of Criminal Appeals has authority under Article 66[ ][, UCMJ,] to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)." 57 M.J. at 224 (citation omitted). The essential inquiry under *Tardif* is whether, given the post-trial delay, the sentence "remains appropriate[ ] in light of all circumstances." *Toohey*, 63 M.J. at 362 (citing *Tardif*, 57 M.J. at 224).

### 2. Analysis

Appellant's case was docketed with the court on 5 October 2022. The delay in rendering this decision after 5 April 2024 is considered presumptively unreasonable. The reasons for the delay include the time required for Appellant to file his brief on 8 September 2023, the Government to file its answer on 23

October 2023, and Appellant to file his reply brief on 17 November 2023.[21] Appellant has made no specific claim of prejudice, and we find none. Because we find no particularized prejudice, and the delay is not so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, there is no due process violation. *See Toohey*, 63 M.J. at 362.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, or *Tardif* in the absence of a due process violation. *See United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, authority to grant relief for the delay in completing appellate review.

### E. Entry of Judgment

In our review of the findings and sentence as entered into the record under Article 60c, UCMJ, we note an error in the required contents of the EoJ. *See* R.C.M. 1111(b). Although the finding of guilty to the Specification of Charge III is entered correctly, the summary of that offense is not. The summary incorrectly states TLP's last name where it should state Appellant's last name.[22] The charge sheet and the Statement of Trial Results do not contain this error. We note Appellant has not claimed prejudice from the error and we find none. Rather than remand the case, we employ our authority under R.C.M. 1111(c)(2) and modify the EoJ in our decretal paragraph.

### III. CONCLUSION

The entry of judgment is modified as follows: for the Specification of Charge III, the findings language is modified by excepting TLP's last name in the portion that reads "in that SENIOR AIRMAN TERRY L. [TLP's last name] actually struck," and substituting therefor Appellant's last name and suffix, such that it reads "in that SENIOR AIRMAN TERRY L. PITTMAN III actually struck." The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

---

[21] Appellant filed ten motions for enlargement of time, all of which were opposed by the Government.

[22] We note that both the victim TLP and Appellant had the same rank and initials.

Accordingly, the findings, as modified, and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court